David R. Ongaro (State Bar No. 154698)
dongaro@ongaropc.com
Scott S. Shepardson (State Bar No. 197446)
sshepardson@ongaropc.com
Glen Turner (State Bar No. 212417)
gturner@ongaropc.com
ONGARO PC
1604 Union St.
San Francisco, CA  94123
Telephone: (415) 433-3900
Facsimile:  (415) 433-3950

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| WILLIAM VILLARROEL, LIESE L. SAND and ROBERT F. SAND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>RECOLOGY, INC., a California Corporation, RECOLOGY SAN FRANCISCO, a California Corporation, SUNSET SCAVENGER COMPANY, a California Corporation and GOLDEN GATE DISPOSAL & RECYCLING COMPANY<br><br>Defendants. | Case No. 4:24-cv-03266-HSG<br><br>**PLAINTIFF'S FOURTH AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, TREBLE DAMAGES, RESTITUTION AND INJUNCTIVE RELIEF**<br><br>[Cal. Code Civ. Proc. §§ 382, 1781]<br><br>Unlimited Civil – Amount Demanded Exceeds $25,000.00<br><br>VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAWS ("UCL") AT CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTIONS 17200, *ET SEQ.*; VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT AT CALIFORNIA CIVIL CODE SECTIONS 1750 ET SEQ.; VIOLATION OF SAN FRANCISCO CAMPAIGNS AND GOVERNMENT CODE SECTION 3.216; VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968; FRAUD; BREACH OF CONTRACT<br><br>**-JURY TRIAL DEMANDED-** |

Plaintiffs William Villarroel, Liese L. Sand and Robert F. Sand, individually and on behalf of all others similarly situated (collectively, the putative "Class" members), upon both personal knowledge and information and belief, and based upon an investigation made by Plaintiffs' counsel of the criminal indictments and criminal please involving Recology's officers, and of other facts including a review of disseminated public statements and information, hereby allege as follows:

## I.    INTRODUCTION

1.    Plaintiffs William Villarroel, Liese L. Sand and Robert F. Sand (Collectively, "Plaintiffs" and each a "Plaintiff") bring this putative class action against Defendants Recology Inc., Recology San Francisco, Sunset Scavenger Company and Golden Gate Disposal & Recycling Company, inclusive (collectively, "Defendants" or "Recology" and each a "Defendant") for engaging in unlawful, unfair and fraudulent business acts or practices to obtain improper garbage collection rate increases from the City and County of San Francisco (hereinafter referred as "City") and concealing its unfair business practices from ratepayers— namely, residential tenants and property owners alike in the City.

2.    Plaintiffs allege that Defendants committed and/or engaged in unlawful, unfair and fraudulent acts under the Unfair Competition Law, Business and Professions Code section 17200, *et seq.,* (the "UCL"), including concealing information concerning appropriate rates and bribing City officials to obtain improper rate increases to unfairly maximize Defendants' profits.

3.    Plaintiffs seek restitution, declaratory judgment, injunctive relief, and other equitable relief on behalf of Plaintiffs and the Class for their UCL claims. As a result of Defendants' unlawful, unfair, fraudulent, and/or illegal acts, Defendants reaped and continue to reap unfair benefits and fraudulently obtained profits at the expense of Plaintiffs and the Class.[1]

---

[1] *See* Department of Justice press release quoting FBI Special Agent in Charge, Craig D. Fair, "The FBI takes seriously any actions of individuals who seek to improperly influence public officials at the expense of the rate-paying public, and will hold accountable those who attempt to gain an unfair advantage in the public contracting process". https://www.justice.gov/usao-ndca/pr/san-francisco-trash-company-executive-charged-bribing-company-s-chief-san-francisco

FOURTH AMENDED CLASS ACTION COMPLAINT

4.    Furthermore, Plaintiffs and the Class also seek restitutionary disgorgement from Defendants[2] as well as reasonable attorneys' fees pursuant to California Code of Civil Procedure section 1021.5, because this lawsuit pursues the enforcement of an important right affecting the public interest and satisfies the statutory requirement for an award of attorneys' fees.

5.    Plaintiffs also allege that Recology committed fraudulent acts consisting of intentional and indirect misrepresentations against Plaintiffs and concealment from Plaintiffs to whom they had a duty to disclose against Plaintiffs and the Class. Plaintiffs seek compensatory and punitive damages for those claims.

6.    Plaintiffs also allege that Recology violated the Racketeering Influenced and Corrupt Organization Act ("RICO") by engaging in a conspiracy to commit predicate offenses as detailed below; and by engaging in a pattern of racketeering activity proximately causing harm to plaintiffs herein; and that said conspiracy and racketeering activity has and had an effect on interstate commerce. Plaintiffs seek treble damages for those claims.

7.    Plaintiffs and the Class therefore seek compensatory, general and specific damages, treble damages, and punitive damages for Recology's fraudulent actions, as well as for Recology's malice, oppression, and fraud and Recology's conspiracy to violate RICO and acts in furtherance of that conspiracy.

8.    The "Class Period" is designated as the period from 2013 through the present. Defendants' violations have been ongoing for years prior to the filing of this action, are continuing at present, and will continue unless and until enjoined by the Court.

9.    Plaintiffs reserve the right to name additional representatives.

10.    Plaintiffs' attorneys are excluded as class members.

///

---

[2] Restitutionary disgorgement applies to Plaintiffs and the Class because they have a vested ownership interest in the monies and funds unfairly, unlawfully and fraudulently obtained by Defendants through bribery. (*See Korea Supply Company v. Lockheed Martin Corp*., 29 Cal.4th 1134, 1149 (2003) (Restitutionary disgorgement is available under the UCL as the object of restitution is to restore the status quo by returning to plaintiff funds in which she has an ownership interest).)

## II.    PARTIES

11.    Plaintiffs and the Class are comprised of Recology customers in the City, where at all times herein alleged, Defendants' conduct occurred.

12.    At all relevant times, Plaintiffs and the Class were subject to the same or similar policies, practices, and procedures governing Defendants' garbage collection rates.

13.    At all relevant times, Plaintiff William Villarroel ("Mr. Villarroel") was a rate-paying customer of Defendants and resided in the City.

14.    At all relevant times, Plaintiff Liese L. Sand ("Ms. Sand") was a rate-paying customer of Defendants in connection with properties owned by Ms. Sand in the City.

15.    At all relevant times, Plaintiff Robert F. Sand ("Mr. Sand") was a rate-paying customer of Defendants in connection with properties owned by Mr. Sand in the City.

16.    Defendant RECOLOGY INC. is a California Corporation with its principal place of business located at 50 California St., 24th Floor, San Francisco, California 94111.

17.    On information and belief, Defendant RECOLOGY SAN FRANCISCO is a subsidiary corporation of RECOLOGY, INC. which is organized and existing under the laws of the state of California.  RECOLOGY SAN FRANCISCO maintains its principal place of business at 50 California St., 24th Floor, San Francisco, California 94111.

18.    On information and belief, Defendant SUNSET SCAVENGER COMPANY is a subsidiary corporation of RECOLOGY, INC. which is organized and existing under the laws of the state of California.  SUNSET SCAVENGER COMPANY maintains its principal place of business at 50 California St., 24th Floor, San Francisco, California 94111.

19.    On information and belief, Defendant GOLDEN GATE DISPOSAL & RECYCLING COMPANY is a subsidiary corporation of RECOLOGY, INC. which is organized and existing under the laws of the state of California.  GOLDEN GATE DISPOSAL & RECYCLING COMPANY maintains its principal place of business at 50 California St., 24th Floor, San Francisco, California 94111.

///

20.    All Defendants--RECOLOGY INC., RECOLOGY SAN FRANCISCO, GOLDEN GATE DISPOSAL & RECYCLING COMPANY and SUNSET SCAVENGER COMPANY are collectively referred to as "Recology," meaning that the terms "Recology" and "Defendants" are used interchangeably.

21.    Recology is and has at all relevant times been, a waste management company with a monopoly to provide refuse collection services for residential (including apartment buildings) and commercial properties in San Francisco, and at all relevant times employed more than five employees. Recology also provides refuse collection services for the City government and its departments and other units.

22.    Plaintiffs are informed and believe that each Defendant, whether named or fictitious, was the agent, employee, or other person acting on behalf of every other Defendant, and in committing the violations alleged in this Complaint, acted within the scope of such agency or employment and ratified the acts of each other Defendant.

23.    Plaintiffs are also informed and believe that each participant in the Enterprise pled below was an agent, employee, or other person acting on behalf of Recology, and that in committing the violations alleged in this Complaint, acted within the scope of such agency or employment. Plaintiffs are also informed and believe that Recology ratified the acts of each participant in said Enterprise.

24.    In doing the acts or omissions complained of, Defendants, their agents and employees acted in concert and/or conspired with each other. Similarly, in engaging in the conduct alleged, each and every Defendant was acting within the course and scope of this agency or employment and was acting with the consent, permission, and authorization of each of the remaining Defendants. All actions of each Defendant alleged in this complaint were ratified and approved by the officers or managing agents of every other Defendant.

25.    In doing the acts or omissions complained of, each participant in the Enterprise alleged below, their agents and employees, acted in concert with Recology and/or conspired with Recology. Similarly, in engaging in the conduct alleged, each and every participant in the

Enterprise acted within the course and scope of this agency or employment and was acting with the consent, permission, and authorization of Recology. All actions of each participant in the Enterprise alleged below and their agents and employees that are alleged in this complaint were ratified and approved by persons at Recology with job authorities that allowed him or her to make decisions for the whole of Recology.

## III.    JURISDICTION AND VENUE

26.    This Court has jurisdiction over the claims brought in this Complaint because certain of Plaintiffs' claims arise under federal law and the adjudication of this matter involves federal law and rights.

27.    This Court is the proper venue, and this action is properly filed in the United States District Court of the Northern District of California, because Defendants transact business and the actions sued upon occurred within the County of San Francisco and the Northern District of California, and Defendants have their principal places of business in the City and County of San Francisco.

## IV.    FACTUAL BACKGROUND

28.    On information and belief, before 2009, Recology was known as Norcal Waste ("Norcal").

29.    In 1998, San Bernardino County Administrative Officer James Hlawek resigned. He subsequently cooperated with local and federal investigators looking into a conspiracy wherein Hlawek and several other County officers pled guilty to receiving substantial payments as part of a conspiracy with a Norcal vice president to steer the county's landfill contracts to Norcal.

30.    In 2007, Norcal was indicted, along with former San Jose Mayor Ron Gonzales, in connection with allegations that, in another public corruption scheme, Gonzales and other public officials had steered over $11 million in public money to Norcal in exchange for having Norcal's recycling subcontractor become a union shop for the Teamsters, a contributor to Gonzales' campaigns. On information and belief the indictment was dismissed primarily because prosecuting an official on that theory threatened the First Amendment rights of its participants, and not on any

1    factual basis.

2    31.    Because of these and other events, Recology has an institutional memory of the

3    impact that corruption and bribery in the sphere of municipal politics and governance may have.

4    Recology gained this memory and knowledge, before the events that are the subject of this lawsuit

5    occurred, and had been made aware thereby of the legal, economic and moral consequences of

6    such acts before engaging in them, or alternatively negligently failing to prevent them.

7    32.    On November 18, 2020, Paul Giusti ("Giusti"), a former Recology executive

8    working in the City and County of San Francisco (the "City") as Recology's Group Government

9    and Community Relations Manager, was criminally indicted by the United States Attorney's

10   Office for the Northern District of California with two counts of 18 U.S.C. 666(a)(2) (Count 1:

11   Bribery of a Local Official) and 18 U.S.C. 1956 (a)(1)(B)(i) (Count 2: Concealment Money

12   Laundering). A joint taskforce by the Federal Bureau of Investigations (FBI) and the Internal

13   Revenue Service Criminal Investigations unit (IRS) determined that there was probable cause to

14   believe that Giusti bribed Mohammed Nuru ("Nuru"), the former Director of the San Francisco

15   Department of Public Works ("DPW").[3] This scheme underlies the instant Class Action

16   Complaint. Plaintiffs allege that Giusti and others who participated in this scheme took the illegal

17   actions alleged herein on behalf of Recology.

18   33.    On information and belief, in 2018, Giusti, acting for Recology in his official

19   capacity as Recology's Group Government and Community Relations Manager for Recology, and

20   at the behest of officers and executives of Recology with authority to make decisions for the entity

21   as a whole, gave Nuru $20,000 to influence Nuru, as the Director of DPW, to help Recology

22   implement a price increase on waste management fees that it charged both the City of San

23   Francisco ("the City") and, more importantly both financially and for the purposes of this action,

24   residential waste management ratepayers (the "ratepayers").

25   ///

26   

27   [3] The criminal complaint ("Indictment") against Giusti can be found on the U.S. Attorney's press release page: https://www.justice.gov/usao-ndca/pr/san-francisco-trash-company-executive-charged-bribing-company-s-chief-san-francisco

28

34.     This was only one of many such acts throughout the pertinent period. As stated in the later Indictment of Giusti, "Giusti arranged for Recology to provide a stream of benefits to Nuru worth over $1 million, intending to influence and reward Nuru in connection with his role as Recology's regulator…In particular, Recology wanted to ensure Nuru's cooperation in connection with his role in approving Recology's requests for rate increases for residential garbage collection." Further, the Indictment quotes a high-level Recology executive's email to a subordinate stating, "Mohammed [Nuru] is the Director of the DPW who ultimately signs off on our rates. Needless to say, keeping him happy is important." Giusti was the Recology executive tasked with "keeping [Nuru] happy." On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of executives and other persons at Recology with authority to make decisions for the entity as a whole.

35.     The Indictment confirms that "Nuru played a very significant role in the process by which Recology periodically sought to increase the rates paid by the citizens of San Francisco for garbage collection." This process of corruptly influencing Nuru was directed by Recology, which benefited financially from it.

36.     Prior to the Class Period and continuing throughout the Class Period, Recology had a monopoly on refuse collection pursuant to the 1932 San Francisco Refuse Collection and Disposal Ordinance (the "1932 Ordinance"), which dictates how refuse rates are established in San Francisco. Through this Ordinance, Recology has been a contractor to provide all refuse and recycling services for the City and its residents. Importantly, pursuant to the 1932 Ordinance, Recology can only raise the rates it charges residential City customers by first seeking approval from the DPW (*i.e.*, Nuru).

37.     While public hearings are held for objections[4] to be heard on Recology's petition

_____

[4] For example, one such objection expressed the following: "The hikes are unjust and way out of bounds, especially those for buildings with two to five units. Those rate hikes of up to 51% were obscured from the public and hidden from ratepayers; the advertised rate hike of 16.4% the first year applies only to single-family homes. There is no way that such a huge rate increase can be

for rate increases, a "rate board" makes the final decision based on the recommendation of the Director of Public Works (*i.e.*, Nuru). As stated in the Indictment, "Nuru's approval was therefore essential to any request for a rate increase by Recology."

38.    Keeping Nuru happy in order to achieve illegally inflated increases in waste management and disposal rates was the overarching directive and *modus vivendi* of the RICO Enterprise pled *infra*. The directive to keep Nuru happy in order to corruptly elevate those rates did not emanate from any natural persons who were members of the Enterprise, but from Recology itself and all acts done in furtherance of the Enterprise were done on behalf of Recology.

39.    Recology went through a rate increase application process led by Giusti in June 2017 which resulted in an average 20.98 percent increase in rates charged from residential and apartment buildings in the City.[5] On information and belief, in leading this process, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

40.    Recology even praised Giusti for getting the 2017 rate increase awarded and for minimizing the negative media and press regarding the increase structure.

41.    On information and belief, Giusti's efforts to raise residential rates coincided with increases to commercial refuse rates as well as to the City's municipal garbage collection rates.

42.    As recently as November 2018, Giusti agreed to give Nuru $20,000 to secure Nuru's support for Recology's efforts to implement a price increase of approximately 30% on "tipping fees" it charged the City to dump a variety of materials at a Recology facility, which in some cases was double the original price. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with

---

justified." *See* https://sfpublicworks.org/sites/default/files/Final%20Agenda%206-16%206-19%206-21%202017.pdf

[5] In 2017 the Social Security Agency's cost-of-living adjustment to Social Security benefits, a well-known marker of national inflation was 0.3 percent, approximately $1/70^{th}$ of the increase in Recology's 2017 waste management rates.

FOURTH AMENDED CLASS ACTION COMPLAINT

1    authority to make decisions for the entity as a whole.

2        43.    On information and belief, payments from Recology to Nuru occurred through non-

3    profit agencies including the Lefty O'Doul's Foundation for Kids, a non-profit organization for

4    underprivileged children in San Francisco. As the Indictment confirms from an intercepted call,

5    "Nuru confirmed that the purpose of Recology's 'holiday donation' to the Lefty O'Doul's

6    Foundation was to pay for the DPW holiday party and not to help underprivileged children

7    experience baseball."

8        44.    On information and belief, and based on information in the Indictment, Recology,

9    acting through numerous of its executives and management level personnel, specifically enlisted

10   Giusti's help in obtaining the rate increases from DPW/the City because Giusti had a direct and

11   "special" relationship with Nuru.  The Indictment explains, "Giusti aided and abetted Recology's

12   efforts to bribe Nuru and conceal the bribe payments as charitable donations with the knowledge

13   and approval of his supervisors…."

14       45.    U.S. Attorney David L. Anderson explained:

15       "[] Paul Giusti bribed Mohammed Nuru with more than $1 million of party funds
         and other benefits[.]" "These bribes were laundered through non-profit
16       organizations to disguise their source and to create the false appearance of a
         legitimate charitable intent.  In return for these bribes, Nuru helped Recology
17       obtain garbage fee increases approved by the City but paid by an unsuspecting
         public. **As** our investigation continues, each charge sheds new light on the ways
18       and means of City Hall corruption."[6]

19

20        Based on the foregoing, Defendants engaged in unfair, unlawful and fraudulent business

21   practices in California and willingly and knowingly engaged in patterns and practices that violated

22   Business & Professions Code section 17200 *et seq*. Plaintiffs and, on information and belief, all

23   other similarly situated putative Class members suffered harm due to Defendants' actions.

24   *Tipping Fees*

25       46.    Although Plaintiffs and the class were not damaged directly by the "tipping fees"

26   episode, it is illustrative of the corrupt relationship between Recology and Nuru that harmed

27   ───────────────
     [6] *See* https://www.justice.gov/usao-ndca/pr/san-francisco-trash-company-executive-charged-
28   bribing-company-s-chief-san-francisco

FOURTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs and the class through the imposition of elevated residential waste management rates obtained by corruption. This episode demonstrates the exact same *modus operandi* by which Recology fraudulently and corruptly obtained inflated waste management rates

47.     In November 2018 Recology arranged to give $20,000 to Mohammed Nuru, then the Director of the San Francisco Department of Public Works ("DPW"), for Nuru's use in throwing the annual DPW holiday party. Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, when he agreed to give the money to Nuru to influence Nuru's actions as the Director of DPW, specifically his efforts to help Recology implement a price increase on dumping fees, known as "tipping fees," that it charged the City. Nuru and Giusti arranged for Recology's payment to be concealed as a "holiday donation" to the Lefty O'Doul's Foundation for Kids, a non-profit organization for underprivileged children in San Francisco. Giusti then arranged for Recology to issue a $20,000 check to the Lefty O'Doul's Foundation and mailed it to Nuru, who gave it to Nick Bovis, the head of that Foundation.

48.     Bovis used the money to pay for expenses associated with Nuru's holiday party and not for underprivileged children.

49.     As described more fully below, this was an increase over Recology's prior $15,000 contributions to Nuru's holiday party and the increase was explicitly tied to the request for higher tipping fees.

50.     Tipping fees were at that time governed by Recology's Term Contract 75961 (TC#75961) with the City, entered into on August 1, 2015.

51.     Recology planned to increase the amount of the City's tipping fees on August 1, 2018 by up to from 30% to double. However, Recology did not follow the process for increasing prices mandated by law. On July 2, 2018, Recology Executive 1 had emailed Nuru, forwarding a price sheet including the increased tipping fees Recology desired. On information and belief, in taking these actions, Recology Executive 1 acted for Recology in his or her official capacity, and

at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

52.    A few days later, Recology SF General Manager A forwarded this email to the DPW employee responsible for TC#75961, referencing a discussion with Nuru and requesting that the new prices be implemented. On information and belief, in taking these actions, Recology SF General Manager A acted for Recology in his or her official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

53.    Recology SF General Manager A emailed two other Recology employees shortly thereafter stating that "The ball is in motion with the PI. I think it's going to take a few more volleys to get it over the net." On information and belief, in taking these actions, Recology SF General Manager A acted for Recology in his or her official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

54.    After reaching out again to the same DPW employee, Recology invoiced the City in August and September based on the increased tipping fees.

55.    In October, an Assistant Purchaser in the City's Office of Contract Administration requested a one-year extension on TC#75961, and the extension, which did not mention any price increase, was signed on October 2, 2018. Nevertheless, Recology continued to base a November 12, 2018 invoice for October 2018 services on the desired pricing increase and not on the signed extension.

56.    On November 26, 2018, Recology Executive 1, acting for Recology in his or her official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, forwarded to Nuru an email from Recology SF General Manager A stating that the City was not honoring the negotiated price increase, writing that "As discussed, any help you could provide getting the new purchaser aware of our price change would be appreciated." Nuru emailed back about 90 minutes later, "Working on situation."

57.    On that same day, Nuru spoke to Nick Bovis, Director of the Lefty O'Doul Foundation for Kids, on an intercepted phone call about Recology's payment for the DPW holiday

party, telling Bovis he had asked Recology "to do a new amount for me."

58.    Later that evening, Giusti, acting for Recology in his official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, called Nuru on an intercepted call. After Nuru requested that Recology increase its $15,000 holiday party contribution to $20,000, this exchange took place:

NURU: And then I'm working on the other thing for [Recology Executive 1], so…

GIUSTI: Okay, perfect.

NURU: I sent him the freeway people, I sent him that and then I'm trying to get him the price increase for the…

GIUSTI: Tipping.

NURU: For the specialty, yeah.

59.    The next day, Giusti, acting for Recology in his official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, sent an email to Recology Assistant A with a check request for a $20,000 donation to the Lefty O'Doul Foundation, asking that the check be gotten out as quickly as possible. On information and belief, in taking these actions, Recology Assistant A also acted for Recology in his or her official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

60.    Also the next day, Nuru called Nick Bovis to tell him that Recology was going to send him "twenty grand."

61.    The check was issued on November 29 and Giusti informed Nuru on November 30 on an intercepted call that the check was ready. Nuru asked Giusti to give it to him directly.

62.    After the payment was arranged, Giusti arranged for a congratulatory dinner at Harris' Restaurant on December 20, 2018, attended by Giusti, Nuru, Recology Executive 1 (who paid the $1,182.23 check), Recology Executive 2, and DPW Deputy Director A. This was an opportunity for Giusti to give Nuru the check directly. On information and belief, Giusti, Recology Executive 1, and Recology Executive 2 attended this dinner in their official capacity as officers of

Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

63.     Thus the increase in Recology's holiday party contributions is explicitly tied to the increased tipping fee obtained by Recology. The money was directed through the Lefty O'Doul Foundation to launder the bribe.

64.     The "tipping fees" episode was part of a much larger pattern and course of conduct, described *infra*, in which Giusti, acting for Recology in his or her official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, arranged for Recology to provide a stream of laundered benefits to Nuru worth over $1 million, intending to influence and reward Nuru in connection with his role as Recology's regulator.

65.     Recology had a regular, ongoing need for Nuru's assistance and approval. In particular, Recology wanted to ensure Nuru's cooperation in connection with his role in approving Recology's requests for rate increases for residential garbage collection. Recology also wanted to ensure that Nuru approved Recology's other requests for funding and otherwise resolved issues Recology encountered in connection with City contracts and approvals, such as the "tipping fee" price increase described above.

*Giant Sweep*

66.     Earlier, Recology agreed in January 2013 to donate $80,000 to Giant Sweep, an anti-litter volunteer program created in honor of the San Francisco Giants' sweep of the Detroit Tigers in the 2012 World Series.

67.     DPW hosted a number of Giant Sweep events from 2013 until about 2018.

68.     The original donation was closely tied to Recology's 2013 rate increase application and began with Recology's agreement to give Nuru $100,000 a year for Giant Sweep in January 2013, during the rate increase application process.

69.     Recology paid $40,000 to Non-Profit A on or around February 14, 2013, 3 days after DPW notified Recology that its draft application was complete.

70.     Recology had contributed a total of $80,000 to Non-Profit A for Giant Sweep by the time Nuru issued his final report in June 2013, approving Recology's requested rate increase.

71.     Recology then gave Non-Profit A another $20,000 on or around the date of the rate increase.

72.     Giusti also at that time orchestrated a holiday donation to the Lefty O'Doul Foundation, which he knew to be a conduit for holiday party expenses. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

73.     Between February 2013 and November 2019, Recology made 35 payments totaling over a million dollars to Non-Profit A as Giant Sweep donations.

74.     Giusti arranged for these payments at the direction of Nuru and Non-Profit A to influence Nuru's actions as a regulator. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

75.     Nuru and Non-Profit A arranged for the money to be immediately passed to Non-Profit B, where it was deposited into accounts that NURU used as a slush fund for his professional benefit.

76.     Non-Profit A consistently retained 5% of the donation before passing the money along to Non-Profit B. On information and belief, this 5% was a money-laundering fee. Most frequently, Recology would provide $30,000 to Non-Profit A, which deducted an administrative fee of 5% and then sent a check for $28,500 to Non-Profit B within one to two weeks.

77.     On information and belief, Non-Profit A did not hold the money long enough to incur legitimate overhead costs, but simply passed the money along, minus its taste.

///

///

FOURTH AMENDED CLASS ACTION COMPLAINT

78.     From 2014-18, Non-Profit A, a 501(c)(3) organization, got 80% of its funding from the City and County of San Francisco. The remainder of its money came mostly from Recology, particularly from 2016-2018.

79.     On information and belief, Non-Profit A did not receive any other donations for Giant Sweep in that time frame.

80.     Nuru directed the flow of Recology's money from Non-Profit A to Non-Profit B. Recology, through its officer and agent Giusti, was aware of the roles played by Non-Profit A and Non-Profit B in the money laundering scheme and knowingly facilitated it by providing the proceeds of bribery to Non-Profit A to aid in laundering.

81.     Multiple text messages from Nuru to Non-Profit A's director instructed him to forward payments to Non-Profit B. For example, on or around October 25, 2018, Recology wired $30,000 to Non-Profit A. On November 6, 2018, Non-Profit A's Executive Director texted Nuru, "Hi. Got another GS donation. Should I cut a check to [Non-Profit B]?" Nuru texted back, "Yes."

82.     In a later intercepted call, on March 25, 2019, Nuru referred to the Giant Sweep payments as the "big one." Later in the same call, Nuru advised Giusti that he was worried that Non-Profit B was "getting too big," so he had to "make sure they're comfortable and everything."

83.     On information and belief, Nuru was concerned about Non-Profit B "getting too big" because he was concerned that they would initiate formal financial controls over the intake and egress of funds.

84.     Nuru regularly monitored accounts at Non-Profit B and at times directed transfers between accounts even though donations to Non-Profit B were purportedly made for specific purposes and deposited into the corresponding accounts.

85.     One of the Non-Profit B accounts was referred to as the "Special Projects" account. Nuru or his close associates approved of all expenditures from the Special Projects account, while Non-Profit B, purportedly the administrator of the accounts, played no role in approving expenditures.

///

86.    Funds from the Special Projects account were in fact used to pay for deejay services, hats, t-shirts and other merchandise, Bay to Breakers entry fees for DPW employees, mortuary-related expenses, and thousands of dollars to cover the costs of food and other vendors for DPW events, including photo booths, a chocolate dessert fountain, holiday quartets, and specialty lighting for the annual DPW holiday parties.

87.    In the spring of 2015, Recology began preparing its next rate increase application. At the time, Recology's plan was to file a Notice of Intent on July 2, 2015.

88.    Nuru was scheduled to meet with Giusti and Recology Executive 2 on March 25, 2015 to discuss "Updates re: Rate Application/New Facilities."

89.    On May 20, 2015, Non-Profit A's Executive Director wrote to Giusti and Recology Assistant A, "We did not receive the Giant Sweep donation for May? Please advise." Recology was aware that the Giant Sweep donations to Non-Profit A were part of the overall scheme to keep Nuru happy through bribery in order to obtain elevated rates, and was alarmed at learning that one of its bribes had apparently not gone through at a critical time a few weeks before it planned to file for a rate increase.

90.    Within minutes, Giusti and Recology Executive 1, two persons in leadership positions at Recology acting in their authority as Recology's agents and on Recology's behalf, were emailing each other and others within Recology, urgently trying to find out what happened to the payment and arranging for a check to be cut and mailed as soon as possible.

91.    Giusti, acting on Recology's behalf, wrote to Recology Executive 1 and others, "Can you let us know when the check will be cut. This is embarrassing and is the second check just today alone that has come to the DPW Directors attention where we have failed to meet our payment commitment."

92.    About fifteen minutes later, at approximately 12:26 p.m., Giusti wrote to Recology Executive 1, "I got my ass chewed out this morning from Mohammed and actually had to promise to write a personal check to a non-profit that has been waiting months to get paid!" Recology Executive 1 wrote back to Giusti about ten minutes later, "We should sit down and discuss all the

politically sensitive payments that we make on a recurring basis so that we can check to ensure that those are paid regularly." Giusti replied, "Not paying our commitments timely negates all the good will we build by making the donation/sponsorship in the first place."

93.    Approximately one hour later, Recology Executive 1 himself prepared, signed and emailed a check request form for the $30,000 payment to Non-Profit A, with a note indicating, "Please pay as soon as possible." He sent it to the accounts payable supervisor, asking her, "Can you pay off of this? If so, when can you pay? If not, let me know what we need to do. Our office is closed, [Recology Executive 2] is on vacation and this needs to be paid as soon as possible."

94.    Recology Executive 1, acting on behalf of Recology also forwarded Giusti's 12:26 p.m. email about his encounter with Nuru to the Assistant Corporate Controller of Recology. He wrote, "FYI – Mohammed is the Director of the DPW who ultimately signs off on our rates. *Needless to say, keeping him happy is important*. (emphasis added)"

95.    On information and belief, in taking the actions alleged here as occurring on May 20, 2015, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology and Recology Executive 1 also acted for Recology in his or her official activity. Both Giusti and Recology Executive 1 acted at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

*Holiday parties*

96.    To ensure that Nuru would act in Recology's favor, Giusti arranged for Recology to provide Nuru with a continuous stream of additional money and benefits over a period of several years. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

97.    For example, Recology made annual contributions from 2016 to 2019 to pay for the DPW holiday party, disguised as and laundered through charitable donations to the Lefty O'Doul's Foundation.

98.    As described above, Recology funneled approximately $1,000,000 to Nuru through Non-Profit A and Non-Profit B.

*Nuru's Son*

99.    In June 2015, while Recology was preparing to submit the Notice of Intent for its planned rate increase application, Giusti arranged for Recology to hire NURU's son.

100.    On the morning of June 17, 2015, Giusti, acting for Recology in his official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, met with Recology SF General Manager A to discuss the schedule for the upcoming rate increase application. That afternoon, Giusti forwarded Nuru's son's cell phone number to a Human Resources employee at Recology, telling her, "This is what I got from Mohammed." A few hours later the Human Resources employee, acting as Recology's agent, advised Giusti that she would call Nuru's son and connect him with Recology's staffing agency.

101.    The next morning, on June 18, 2015, Recology Executive 1, acting for Recology in his or her official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, sent the draft schedule for the rate application process to Nuru's immediate subordinate at DPW.

102.    Approximately one hour later, Giusti advised Recology's Human Resources employee in an email that "Mohammed said he [Nuru's son] should be ready to start on Monday."

103.    Shortly afterwards, the Human Resources employee expressed concern about Nuru's son in an email to Giusti: "I feel like we are going to have issues. [Nuru's son] doesn't seem happy….I asked him if he still wanted to work at Recology, and he said he wanted to give it a try….I told him that he didn't seem to know much about the job, so I told him that he was going to be working from 8-2 M-F….What do you think?"

104.    The next evening, on June 19, 2015, the Human Resources employee sent Giusti an email with high importance, advising that she had contacted NURU's son again and he had completed the staffing agency paperwork that day and just needed to complete his work permit before he could start. On information and belief, in taking these actions regarding Nuru's son,

Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

105.    NURU's son began working at Recology as a temporary laborer on or around June 22, 2015, painting debris boxes. He left to return to school in or around August 2015.

106.    On August 10 and 11, the manager of the Recology unit where NURU's son worked paid almost $900 to Costco and Toto's Pizzeria for "going away lunch supplies for [Nuru's son] and drivers appreciation."

107.    In September 2015, Recology hired NURU's son again. He worked part-time during the 2015-2016 school year, and again during the summer of 2016 after he graduated from high school.

108.    From February 2016 through the end of summer 2016, Nuru's son was the only temporary worker supplied by the staffing agency to Recology.

109.    While these events were occurring, Recology continued to work on its upcoming rate increase application.

110.    On September 2, 2016, Recology sent its Notice of Intent letter to Nuru, advising him that Recology would be submitting a draft rate application in early January 2017. The Notice of Intent triggered the official beginning of the months-long rate increase application process, over which Nuru had significant influence.

111.    On February 10, 2017, Recology submitted its formal rate application.

112.    Nuru then held multiple public hearings in March and April 2017, at which Recology executives including Giusti testified. During these hearings, Recology falsely represented to the Rate Board, by presenting selected and misleading information, that the proper waste management rate was the rate that Recology desired. Recology made these representations with the intent that the substance of the representations would be repeated to ratepayers in the form of elevated rates.

///

FOURTH AMENDED CLASS ACTION COMPLAINT

113.    On May 12, 2017, Nuru submitted his Report and Recommended Order on Recology's requested rate increase.

114.    In it, Nuru recommended that the Rate Board accept most of the increase that Recology asked for, an average increase of approximately 21 percent. The Social Security cost-of-living adjustment for 2017 was 0.3%, 1/70 of the increase requested by Recology.

115.    Shortly afterwards, in or around the week of May 21, 2017, Nuru's son returned to work for Recology part-time as a painter.

116.    On June 8, 2017, Recology terminated NURU's son at an in-person meeting with two of the highest-level executives at Recology, Recology Executive 2 and Recology SF General Manager B. Nuru's son was terminated because it would not look good for Recology to employ the son of its regulator.

117.    Recology terminated Nuru's son at one of the final moments in the rate increase process. After Nuru issued his report approving Recology's request for a rate increase in May 2017, the public was allowed to submit objections. Nuru then had to respond to objections. At the time Recology terminated Nuru's son, Nuru's responses to the objections—most of which claimed that the increase was too high—were pending. After the objections were rejected or otherwise resolved, the Rate Board would make a final decision about Recology's rate increase request, based on Nuru's recommendation.

118.    It was therefore important, as Recology Executive 1 had previously noted, to keep Nuru happy, and Recology moved swiftly to do so.

119.    Giusti served as chairman of the board of a local non-profit organization, Non-Profit Organization C ("Non-Profit C").

120.    Giusti was aware that Non-Profit C was interested in creating a summer internship program and was looking for funding.

121.    Giusti then arranged for Recology to fund a summer internship program at Non-Profit C. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and

at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

122.    The summer intern was NURU's son, who began working at Non-Profit C on June 14, 2017, six days after he was terminated from Recology and the very same day that Nuru responded to the public's objections to his recommendation to approve Recology's rate increase. At the end of that week, on June 19, 2017, the Rate Board adopted NURU's recommendation and approved Recology's request for a rate increase.

123.    Because Recology needed Nuru's son to be employed immediately in order to keep Nuru happy during a critical point in the ratemaking process, the hiring was so rapid that Nuru's son did not fill out an employment application until his first day of work, June 14, 2017. Although Nuru's son was working with young children, he did not complete his State of California Live Scan fingerprint check until July 12, 2017, and he did not fill out his W-4 withholding form for a full month, until July 25, 2017. He was paid $18 an hour by Non-Profit C, $2 per hour more than his supervisor for the first month.

124.    Nuru's son was a challenging employee who was not trusted by his co-workers, but he remained the entire summer and Recology paid Non-Profit C's $9,600 invoice for its "Summer Youth Program."

125.    Nuru's son was hired again in summer 2018, and shortly thereafter he was reprimanded for physically harming a child when he "grabbed his arm and twisted it enough that his hand 'cracked.'" Nevertheless, Non-Profit C kept him on, and at the end of the summer Recology paid Non-Profit C's $14,000 invoice for its "Summer Youth Intern Program."

*Mortuary Bill*

126.    In 2016, Giusti indirectly arranged for Recology to pay a $3,500 mortuary bill for a deceased DPW employee. Recology paid the mortuary bill after Non-Profit A invoiced Recology $3,500 for a "Donation for DPW Partnership." On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of

Recology with authority to make decisions for the entity as a whole, with the intent to keep Nuru happy so that Recology could receive elevated waste management payments.

127.    Giusti, acting on behalf of Recology, insured the mortuary bill was paid.

*Criminal Charges/Pleas*

128.    While still serving as Director of DPW, Nuru was charged by Criminal Complaint with Honest Services Wire Fraud (18 U.S.C. §§ 1343, 1346) on January 15, 2020 and by a separate Criminal Complaint with False Statements in violation of 18 U.S.C. §1001 on January 28, 2020.

129.    Giusti pled guilty on July 28, 2021 to one count of conspiracy to bribe a local official and commit honest services fraud and agreed to cooperate with the investigation.

130.    On May 3, 2023, Recology executive John Francis Porter pled guilty to conspiring to commit honest services mail and wire fraud in connection with the scheme to bribe Nuru.

131.    Nick Bovis was charged with honest services fraud along with NURU in the January 15, 2020 Criminal Complaint re the holiday parties.

*Recology's Direct Misrepresentations to, and Concealments From, Ratepayers*

132.    The entire San Francisco Bay Area, and specifically San Francisco, has long been known, at least since the Berkeley protests of the 1960s, as a hotbed of political activism and consumer awareness. This reputation is nationwide and persists to this day.

133.    San Francisco has become increasingly known in recent years as a residential area for many workers, executives and entrepreneurs in technological companies, many of whom work with computers and the internet and are active consumers of social media.

134.    San Francisco's population is, on the average, better educated than the population of other comparable metropolises in the United States.

135.    As a company with major operations in San Francisco, Recology is well aware of these facts and has long been aware of the risk of scandal should it engage in improper activities toward San Francisco's ratepayers, a group that has a reputation as being more politically aware and informed than average ratepayers in most if not all other urban areas in the United States.

///

136.     Further, because Recology partnered in the bribery scheme with a high-ranking official of the City of San Francisco, along with other City officers who participated, Recology and its partners were acutely vulnerable to political pressure.

137.     Recology knew from the beginning of the pertinent period that the ratemaking process was tainted with misrepresentations, fraudulent concealment of information, corruption and bribery, producing an unjust and unreasonable result in the form of artificially and unreasonably high waste collection rates. Recology therefore intentionally misrepresented to the ratepayers the implied statement that rates were set by a just, reasonable and legal process, and intentionally renewed its misrepresentation with each billing statement as part of an ongoing scheme to intentionally keep its bribery and corruption secret from ratepayers and most importantly, out of the public eye.

138.     Specifically, Recology's billing communications to ratepayers represented that collection services "are subject to the same fixed rate pursuant to initiative ordinance."

139.     The ordinance that drives the ratemaking process and therefore the ordinance that Recology's billing communications to ratepayers clearly and unambiguously referred to was the Refuse Collection and Disposal Ordinance, adopted November 8, 1932 and found at https://sfpublicworks.org/sites/default/files/2063-1932%20Ordinance.pdf.

140.     Section 6 of the Ordinance, the section dealing with ratemaking, states that San Francisco's Director of Public Works—in this case, Nuru—when presented with an application for an increase in waste disposal rates "shall make such order, to take effect at such time, as may be just and reasonable." Ratepayers who were informed and engaged with current events and/or politics and/or the law therefore appropriately inferred that the rates were set by a just and legal process in a reasonable method and so informed other ratepayers. Recology expected and intended this to happen when crafting the subject billing statements. Recology also knew that these informed and engaged ratepayers were also the persons who were most likely to protest, take legal action, and/or engage in the legal process in an attempt to gain redress and learn the truth, and also were the most likely to influence and lead other ratepayers to do the same, so Recology took this and

FOURTH AMENDED CLASS ACTION COMPLAINT

other actions to conceal or camouflage the truth from those and other ratepayers.

141.    This implied statement was false, as Recology knew that the ratemaking process was tainted with fraudulent concealment, corruption and bribery, producing an unjust and unreasonable result in the form of artificially high waste collection rates. This statement was likely to mislead a reasonable consumer so long as the consumer remained unaware of the underlying corruption but for no longer.

142.    Recology crafted and/or maintained this billing communication as an attempt to keep consumers unaware of the underlying corruption.

143.    Recology intended that ratepayers should continually rely on the renewed statements in its billing communications by continuing to pay their bills without initiating inquiries to, for example, Recology, the City, law enforcement agencies, or consumer representatives and without suing Recology or using political communication and other techniques to create and continually increase political pressure on Recology and its partner in the bribery scheme, the City and City officers.

144.    Plaintiffs read the monthly billing communications, as did members of the class, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing.

145.    All Plaintiffs and class members, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing, were mollified by the false and misleading statements they read in the billing communication implying that rates were set by a just and reasonable process, and in reliance on the communication were lulled into failing to make further inquiries, or to take political or legal action, that would have led to public recognition of the underlying corruption long before the public actually became aware of the corrupt bribery scheme in November 2020.

///

146.    All Plaintiffs, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing, relied on and were mollified by the concealment of true facts from the billing communication they read, and lulled into failing to make further inquiries that could have led to earlier discovery of the underlying corruption.

147.    Ratepayers in the City and County of San Francisco relied on Recology's representations that its collection rates were just and reasonable and set with oversight by the City to ensure that the rates are not wrongly inflated.

148.    With each monthly billing statement to ratepayers, Recology renewed its representation that collection services "are subject to the same fixed rate pursuant to initiative ordinance," continually implying that the rates had been fixed by a "just and reasonable" process. This representation to ratepayers was renewed monthly throughout the pertinent period.

149.    With each billing statement to ratepayers, Recology intentionally did not disclose its knowledge that higher rates were actually purchased by fraud and corruption instead of being fixed by a just and reasonable process.

150.    Plaintiffs and members of the class read the representations each time.

151.    Recology reasonably believed that Ratepayers, who are subject to Recology's monopoly, understood the implied representation that rates are set by a just and reasonable process and Recology therefore intentionally used this language to aid its ongoing efforts to conceal from ratepayers the unlawful, unfair and fraudulent acts, communications and knowledge which actually formed the basis for the improper rates.

152.    Recology reasonably believed that ratepayers would rely on the implied statement that rates were set by a just and reasonable process and that their reliance would prevent them from inquiring into the details of how rates were set or from attempting to arouse public awareness and/or discontent with the ratemaking process or rate levels, as well as from suing Recology for its duplicitous statements and actions, or from engaging in the political process to create pressure on Recology and its partners in the City to charge rates that were just, reasonable and fair instead

of elevated rates procured by bribery and corruption.

153.    In fact rates were not set by a just and legal process in a reasonable method but were procured through bribery and corruption.

154.    Plaintiffs did indeed continually read and rely upon the billing communications, as did members of the class, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing.

155.    Ratepayers thus continued to reasonably rely on Recology, who has the monopoly waste collection service for the City and County of San Francisco and is regulated by the City, to truthfully present them with just and reasonable bills determined by a just and reasonable ratemaking process, and because of their reliance paid their waste collection bills without protest or inquiry and did not initiate legal process

156.    But for Recology's continued intentional misrepresentation, along with its continued concealment of the facts that the rates were not set through a just and legal process in a reasonable method, Plaintiffs would have been able to object to the improper rates, or alternatively would have engaged in the political process to seek redress, and would have done so in sufficient numbers to bring the scandal to the public eye, which would have effectively and promptly ended the practice and begun the process of bringing Recology to justice. Recology's false statements and concealment injured plaintiffs by depriving them of knowledge that would have enabled them to take ameliorative actions against the illegal rate increases.

157.    The bribery scandal finally actually came to the public's attention when Giusti was arrested on November 18, 2020. Only 3-1/2 months later, on March 4, 2021, the Recology and the City announced that the City's investigation of the affair had concluded that Recology would make a $95 million payment to the City, to be disbursed to ratepayers,

158.    Three and a half months is a very short period of time for a scheme of the magnitude alleged to be fully investigated by the City.

///

159.     Three and a half months is also a short period of time for a settlement of this magnitude to be agreed between two parties with adverse interests.

160.     On information and belief, the haste with which the investigation and settlement were completed was because the scandal was now publicly known and was creating a public relations nightmare for Recology's partners in the City of San Francisco, and to a lesser but real degree, for Recology. The hasty investigation and settlement resulted from the combined intent of both Recology and the City to get this story out of the headlines.

161.     The fact that the investigation and then the settlement were each concluded within such a short period of time after the bribery scheme was made public is compelling evidence that earlier discovery of the collusive scheme and publication of same by Plaintiffs and the class would have promptly ended the scheme.

162.     Plaintiffs and class members could and would have brought this scandal to the public's attention years earlier if not for Recology's misrepresentations alleged herein. Earlier publicity of the scandal at any time would have led to its swift end, just as it in fact did when the scandal eventually made headlines in 2020.

163.     But for Recology's continuing concealment of the fact that elevated waste management payments were obtained by bribery, the concealment would have ended promptly and the bribery and elevated waste management payments would have ceased within a short payment of time after the concealment ended. Had the obtaining of elevated waste management rates by bribery not been intentionally and continually concealed, the secret scheme would never have been effective and ratepayers would either have never paid the elevated rates at all or only paid them for a short period of time before they ended.

164.     Ratepayers were instead harmed by being forced to pay inflated waste collection bills throughout the pertinent period.

165.     Ratepayers' reliance on the statement in the billing materials was a substantial factor in their harm because they did not protest, investigate or initiate legal process regarding their bills as they had no information concerning the facts which Recology intentionally concealed, nor

did they have any information regarding Recology's bribery of the individual responsible for approving the rates. Therefore the practice of presenting inflated bills to consumers was allowed to continue unabated.

166.    Plaintiffs engaged in a direct transaction with Recology by paying Recology for waste disposal services, giving rise to a duty for Recology to reveal any concealed information which would have caused any sort of harm to Plaintiffs.

167.    Recology participated in this transaction by directly billing individual Plaintiffs and/or families of Plaintiffs for waste disposal services.

168.    Plaintiffs were damaged as a direct result of Recology's actions by being forced to pay over a period of years, without their knowledge, the difference between a just and reasonable rate and the inflated rate Recology actually charged.

169.    Recology and its co-conspirators were the only persons knowledgeable of the alleged concealment.

170.    Plaintiffs and class members had no ability to learn the concealed information on their own through reasonable efforts.

*Recology's Representations to the Rate Board*

171.    Recology knew from the beginning of the pertinent period that the ratepaying process was tainted with corruption and bribery and capable of producing an unfair result and artificially high waste collection rates due to its bribery of Nuru and perhaps unnamed others. Recology was aware that there was an opportunity for it obtain rates higher than reasonable and lawfully-obtained rates would have been, but that it needed to protect its confederate Nuru by making certain representations that could be used to publicly justify illegally inflated rates, and also to justify them to members of the Rate Board who were not involved in the bribery scheme.

172.    Recology intentionally made representations to the Rate Board during the 2017 ratemaking process regarding its costs, expenses and/or other components considered in the process of proper ratemaking that were false and misled the board into approving higher waste collection rates. The substance of these representations were that proper rates should be set at a

certain level. That certain level of rates constituted a higher rate level than would have been set if Recology had made truthful representations as to its costs, expenses, and/or other components considered in the process of proper ratemaking.

173.    As a result, and with Nuru's assistance, Recology succeeded in achieving approval from the rate board of an illegally elevated rate level.

174.    These false statements from Recology to the Rate Board manifested themselves in approval of higher rates and the Rate Board's publication of these rates was a false representation to Plaintiffs and the class that these inflated rates were at the proper level. This false representation was a repetition of the substance of the false representations Recology originally made to the Rate Board.

175.    By conveying these higher rates to Plaintiffs via their billing statements, Recology indirectly represented to plaintiffs that the higher rates were just and reasonable.

176.    By sending Plaintiffs billing statements with the elevated rates set based on the improper and concealed information, and accompanied by the statement that the rates were set pursuant to initiative ordinance, Recology improperly represented certain facts to Plaintiffs, to wit, that waste collection rates were set by a just and legal process pursuant to an initiative ordinance and in a reasonable method, when Recology was well aware that was not the case. Recology's representations misled the Rate Board into believing that the elevated rates were proper and those representations were then conveyed to Plaintiffs and the class by the Rate Board. This process hoodwinked Plaintiffs and the class into believing that rates were set fairly and legally. But for Recology's concealment of its fraudulent behavior, Plaintiffs could have opposed the implementation of the increased rates.

## V.    CLASS ACTION ALLEGATIONS

177.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-176 above, as though fully set forth herein.

178.    Plaintiffs bring this Class Action Complaint pursuant to California Code of Civil Procedure section 382, on behalf of all current and former residential tenants and property owners

of the City and County of San Francisco who were affected by violations of law, as alleged herein.

179.    The Class that Plaintiffs seek to represent is composed of and defined as follows:

> "All current and former rate-paying customers of Recology in the City and County of San Francisco who were subject to Recology's garbage collection rate increases at any time from 2013 through the date of the Court's granting of class certification."

180.    Pursuant to California Rule of Court 3.765(b), Plaintiffs reserve the right to modify the Class definition with greater specificity or further division into subclasses or limitation to a particular issue.

181.    This action has been brought and may properly be maintained as a class action under Code of Civil Procedure § 382 because there is a well-defined community of interest in the litigation, the proposed class is easily ascertainable, and Plaintiffs are proper representatives of the Class:

> a.    **Numerosity**: The potential members of the Class as defined are numerous and ranging in at least the tens of thousands and therefore joinder of all the members of the Class is impracticable.   While the precise number of putative Class members has not been determined at this time, the precise number is known to Defendants and can be ascertained through discovery, namely using Defendants' records of customers, invoices paid by customers, and other information kept by Defendants.   Notice can also be provided to the Class through publication.

> b.    **Commonality**: There are questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only individual members of the Class.   These common questions of law and fact include, but are not limited to, the following:

> > i.    Whether Recology's actions as alleged herein were unlawful practices prohibited by Cal. Bus. and Prof. Code §17200;

> > ii.    Whether Recology's actions as alleged herein were unfair

FOURTH AMENDED CLASS ACTION COMPLAINT

practices prohibited by Cal. Bus. and Prof. Code §17200;

iii.   Whether Recology's actions as alleged herein were fraudulent practices prohibited by Cal. Bus. and Prof. Code §17200;

iv.   Whether Recology's actions as alleged herein were predicate offenses pursuant to RICO;

v.   Whether Recology participated in a conspiracy pursuant to RICO;

vi.   Whether Recology participated in forming or aiding and abetting a RICO enterprise;

vii.   Whether Recology actions as alleged herein had an effect on interstate commerce;

viii.   Whether Recology obtained garbage collection rate increases from the City as a result of bribing former DPW Director, Mohammed Nuru and thereby resulting in higher garbage rates passed onto rate-paying customers of the City and County of San Francisco (*i.e.*, unsuspecting members of the public);

ix.   Whether Recology was unjustly enriched from engaging in unfair, unlawful and fraudulent conduct by bribing a former City official to obtain higher garbage collection rate increases for Recology rate payers in the City and County of San Francisco in violation of Cal. Bus. and Prof. Code §17200;

x.   Whether Recology offered any gift to an officer or employee of the City of San Francisco with the intention to influence such person in the performance of an official act;

xi.   Whether Recology fraudulently represented to ratepayers that waste collection rates would be set by a just and reasonable process and at a just and reasonable level;

FOURTH AMENDED CLASS ACTION COMPLAINT

xii.    Whether such representation was false;

xiii.   Whether Recology knew that such representation was false or, alternatively, made the representation recklessly and without regard for its truth;

xiv.    Whether Recology intended that ratepayers rely on such representation;

xv.     Whether any such misrepresentation was intentional or negligent;

xvi.    Whether ratepayers reasonably relied on such representations and were damaged thereby;

xvii.   Whether ratepayers were harmed by such representation;

xviii.  Whether ratepayers' reliance was a substantial factor in causing their harm;

xix.    Whether ratepayers relied on Recology's concealment of material information by failing to take the effective measures to end Recology's ongoing process of obtaining illegally elevated waste management rates through bribery that they would have taken otherwise.

xx.     Whether Recology intentionally provided incorrect data to the ratemakers during the 2017 ratemaking with the intent that the substance of its communication to ratemakers—i.e., that rates at a certain inflated level would be just and reasonable—would be repeated to ratepayers;

xxi.    Whether ratepayers reasonably relied on such representations and were damaged thereby;

xxii.   Whether Recology violated San Francisco Campaign and Governmental Conduct Code Section 3.216(a);

FOURTH AMENDED CLASS ACTION COMPLAINT

xxiii. Whether ratepayers were the among the classes of persons that San Francisco Campaign and Governmental Conduct Code Section 3.216(a) was enacted to protect;

xxiv. Whether bribery of government officials was one of the evils San Francisco Campaign and Governmental Conduct Code Section 3.216(a) was enacted to allay;

xxv. Whether Recology had a duty of care toward ratepayers;

xxvi. Whether Recology intentionally failed to disclose its bribery of City officers to ratepayers;

xxvii. Whether, had Recology's bribery of City officers been known to ratepayers, ratepayers would reasonably have behaved differently;

xxviii. Whether ratepayers were harmed by Recology's concealment of its bribery;

xxix. Whether Recology's concealment of its bribery was a substantial factor in causing ratepayers' harm;

xxx. Whether Recology's concealment of its bribery was intentional;

xxxi. Whether Recology's bribery of City officers was known only to Recology and other participants in Recology's unlawful scheme;

xxxii. Whether ratepayers knew of Recology's bribery of City officers;

xxxiii. Whether ratepayers could have learned of Recology's bribery of City officers through a reasonable effort;

xxxiv. Whether Recology engaged in a direct transaction with ratepayers;

xxxv. Whether Recology had a duty to the ratepayers to inform ratepayers of its knowledge that the rates set during the 2017 process were not at a just and reasonable level and/or that

33

FOURTH AMENDED CLASS ACTION COMPLAINT

Recology purchased higher rates with bribes;

xxxvi. Whether ratepayers were damaged by Recology's concealment of its knowledge that the rates set during the 2017 process were not at a just and reasonable level and/or that Recology purchased higher rates with bribes;

xxxvii. Whether Recology made misrepresentations to the Rate Board with the intention that the substance of those misrepresentations —i.e., that waste collection rates at a certain level would be just and reasonable--would be repeated to the ratepayers;

xxxviii. Whether ratepayers reasonably relied upon such representations and were damaged thereby;

xxxix. The appropriate measurement of general, specific and compensatory damages for Recology's acts, omissions and breaches as pled herein;

xl. Whether Recology's conduct alleged herein was "likely to mislead a reasonable consumer;"

xli. Whether Recology, through one or more of its officers, directors and managing agents, committed oppression, fraud or malice sufficient to justify the imposition of punitive damages;

xlii. The appropriate measurement of such punitive damages;

xliii. The appropriate nature of class-wide equitable relief;

xliv. Whether an injunction should be entered against Recology;

xlv. What such an injunction would mandate;

xlvi. How such an injunction would be enforced; and

xlvii. The appropriate measurement of restitution.

c. **Typicality**: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all other similarly situated Class members sustained injuries and were

deprived of property rightly belonging to them, arising out of, and caused by Defendants' common course of conduct in violation of law as alleged herein, in similar ways and for the same types of expenditures.

d. **Adequacy of Representation**: Plaintiffs have no conflicts of interest with the Class that Plaintiffs wish to represent and will fairly and adequately protect the interests of Class Members because it is in Plaintiffs' best interest to prosecute the claims alleged herein to obtain the full remedies due to Plaintiffs and the Class.  In addition, Plaintiffs have retained counsel highly experienced in class action litigation, with significant class action experience.

e. **Superiority of Class Action**: A class action is superior to all other available means for the fair and efficient adjudication of this controversy, as individual joinder of all Class Members would create a danger of inconsistent or contradictory judgments arising from the same set of facts. Class action treatment presents no unusual management difficulties and will allow similarly situated residential tenants and property owner customers of Recology to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. The amount of damages owed to each individual ratepayer may presumably be easily calculated from Recology's records, as can the identities, and in most cases, the locations of individual members of the class.

VI.    **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Unfair Competition in Violation of California Business & Professions Code § 17200 *et seq*.**
**(Plaintiff Individually and on Behalf of the Class Against all Defendants)**

182.    Plaintiffs on behalf of themselves and all other aggrieved Recology customers in the City and County of San Francisco re-allege each and every allegation in paragraphs 1-181 of this Complaint and incorporate by reference each allegation in this cause of action as though fully

FOURTH AMENDED CLASS ACTION COMPLAINT

set forth herein.

183.     The Unfair Competition Law, Business & Professions Code section 17200 *et seq.*, defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business practice, and provides for injunctive and restitutionary relief for violations.

184.     Business & Professions Code section 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the Unfair Competition Law.

185.     The conduct described herein constitutes unlawful, fraudulent, and unfair business practices within the meaning of Business & Professions Code section 17200 *et seq.*, including Recology's concealment of information necessary to properly set garbage collection rates and its successful efforts to bribe Nuru—the City's former DPW Director to assist in concealing the information in order to pass improper garbage collection rate increases, which  were passed along to unsuspecting City customers (*i.e.*, Class members).

186.     Beginning at an exact date unknown to Plaintiffs, Defendants committed unlawful, unfair, and fraudulent business acts and practices as defined by Business & Professions Code § 17200 *et seq.*, by concealing information necessary to properly set garbage collection rates and bribing officials of the City and County of San Francisco to obtain garbage collection rate increases to further line Defendants' pockets at the expense of Plaintiffs and Class members. As a result of Defendants' actions, Defendants unlawfully, unfairly, and fraudulently obtained funds from Plaintiffs and Class members.

187.     As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent acts and practices described herein, Defendants, and each of them, received and continue to hold ill-gotten gains belonging to Plaintiffs and all other similarly situated rate-paying customers of Recology.

188.     Recology knew from the beginning of the pertinent period that the ratemaking process was tainted with fraudulent concealment of information, corruption and bribery, producing an unjust and unreasonable result in the form of artificially and unreasonably high waste collection

rates. Recology therefore intentionally misrepresented to the ratepayers and intentionally renewed its misrepresentation with each billing statement as part of ongoing scheme to intentionally keep its bribery and corruption secret from ratepayers.

189.   Specifically, Recology's billing communications to ratepayers represented that collection services "are subject to the same fixed rate pursuant to initiative ordinance."

190.   The ordinance that drives the ratemaking process and therefore the ordinance that Recology's billing communications to ratepayers clearly and unambiguously referred to was the Refuse Collection and Disposal Ordinance, adopted November 8, 1932 and found at https://sfpublicworks.org/sites/default/files/2063-1932%20Ordinance.pdf.

191.   Section 6 of the Ordinance, the section dealing with ratemaking, states that San Francisco's Director of Public Works—in this case, Nuru—when presented with an application for an increase in waste disposal rates "shall make such order, to take effect at such time, as may be just and reasonable." Ratepayers who were informed and engaged with current events and/or politics and/or the law therefore appropriately inferred that the rates were set by a just and legal process in a reasonable method. Recology expected and intended this to happen when crafting the subject billing statements. Recology also knew that these informed and engaged ratepayers were also the persons who were most likely to protest, take legal action, and/or engage in the legal process in an attempt to gain redress and learn the truth, so Recology took this and other actions to conceal or camouflage the truth.

192.   This implied statement was false, as Recology knew that the ratemaking process was tainted with fraudulent concealment, corruption and bribery, producing an unjust and unreasonable result in the form artificially high waste collection rates. This statement was likely to mislead a reasonable consumer so long as the consumer remained unaware of the underlying corruption but for no longer.

193.   Recology crafted and/or maintained this billing communication as an attempt to keep consumers unaware of the underlying corruption.

///

194.    Recology intended that ratepayers should continually rely on the renewed statements in its billing communications by continuing to pay their bills without initiating inquiries to, for example, Recology, the City, law enforcement agencies, or consumer representatives and without suing Recology or using political communication and other techniques to create and continually increase political pressure on Recology and its partner in the bribery scheme, the City and City officers.

195.    Plaintiffs read the billing communications, as did members of the class, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing.

196.    All Plaintiffs, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing, relied on and were mollified by the false and misleading statements in the billing communication implying that rates were set by a just and reasonable process, and were lulled into failing to make further inquiries, or to take political or legal action, that would have led to public recognition of the underlying corruption long before the public actually became aware of the corrupt bribery scheme in late 2020.

197.    Ratepayers in the City and County of San Francisco relied on Recology's representations that the garbage rates are just and reasonable and set with oversight by the City to insure that the rates are not wrongly inflated, and because of their reliance, failed to take any actions to end the corruption scheme before becoming aware of it in late 2020.

198.    With each monthly billing statement to ratepayers, Recology renewed its representation that collection services "are subject to the same fixed rate pursuant to initiative ordinance," continually implying that the rates had been fixed by a "just and reasonable" process. This representation to ratepayers was renewed monthly throughout the pertinent period.

199.    With each billing statement to ratepayers, Recology intentionally did not disclose its knowledge that higher rates were actually purchased by fraud and corruption instead of being

fixed by a just and reasonable process.

200.    Plaintiffs and members of the class read the representations each time.

201.    Recology reasonably believed that Ratepayers, who are subject to Recology's monopoly, understood the implied representation that rates are set by a just and reasonable process and Recology therefore intentionally used this language to aid its ongoing efforts to conceal from ratepayers the unlawful, unfair and fraudulent acts, communications and knowledge which actually formed the basis for the improper rates.

202.    Recology reasonably believed that ratepayers would rely on the implied statement that rates were set by a just and reasonable process and that their reliance would prevent them from inquiring into the details of how rates were set or from attempting to arouse public awareness and/or discontent with the ratemaking process or rate levels, as well as from suing Recology for its duplicitous statements and actions, or from engaging in the political process to create pressure on Recology and its partners in the City to charge rates that were just, reasonable and fair instead of elevated rates procured by bribery and corruption.

203.    In fact rates were not set by a just and legal process in a reasonable method but were procured through bribery and corruption.

204.    Plaintiffs did indeed continually read and rely upon the billing communications, as did members of the class, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing.

205.    Ratepayers thus continued to reasonably rely on Recology, who has the monopoly waste collection service for the City and County of San Francisco and is regulated by the City, to truthfully present them with just and reasonable bills determined by a just and reasonable ratemaking process, and because of their reliance paid their waste collection bills without protest or inquiry and did not initiate legal process

206.    But for Recology's continued intentional misrepresentation, along with its continued concealment of the facts that the rates were not set through a just and legal process in a

FOURTH AMENDED CLASS ACTION COMPLAINT

reasonable method, Plaintiffs would have been able to object to the improper rates, or alternatively would have engaged in the political process to seek redress, and would have done so in sufficient numbers to effectively and promptly end the practice and begin the process of bringing Recology to justice. Recology's false statements and concealment injured plaintiffs by depriving them of knowledge that would have enabled them to take ameliorative actions against the illegal rate increases.

207.    The bribery scandal finally actually came to the public's attention when Giusti was arrested on November 18, 2020. Only 3-1/2 months later, on March 4, 2021, the Recology and the City announced that the City's investigation of the affair had concluded that Recology would make a $95 million payment to the City, to be disbursed to ratepayers,

208.    Three and a half months is a very short period of time for a scheme of the magnitude alleged to be fully investigated by the City.

209.    Three and a half months is also a short period of time for a settlement of this magnitude to be agreed between two parties with adverse interests.

210.    That first the investigation, then the settlement were both concluded within such a short period of time is compelling evidence that discovery of the collusive scheme by Plaintiffs and the class would have promptly ended the scheme.

211.    Plaintiffs could and would have brought this scandal to the public's attention years earlier if not for Recology's misrepresentations alleged herein. Earlier publicity of the scandal at any time would have led to its swift end, just as it in fact did when the scandal eventually made headlines in 2020.

212.    But for Recology's continuing concealment of the fact that elevated waste management payments were obtained by bribery, the bribery and elevated waste management payments would have ceased within a short payment of time after the concealment ended. Had the obtaining of elevated waste management rates by bribery not been intentionally and continually concealed, the secret scheme would never have been effective and ratepayers would either have never paid the elevated rates at all or only paid them for a short period of time before they ended.

FOURTH AMENDED CLASS ACTION COMPLAINT

213.    Ratepayers were harmed by being forced to pay inflated waste collection bills throughout the pertinent period.

214.    Ratepayers' reliance on the statement in the billing materials was a substantial factor in their harm because they did not protest, investigate or initiate legal process regarding their bills as they had no information concerning the facts which Recology intentionally concealed, nor did they have any information regarding Recology's bribery of the individual responsible for approving the rates. Therefore the practice of presenting inflated bills to consumers was allowed to continue unabated.

215.    But for Defendants' concealment of the unlawful, unfair and fraudulent acts, communications and knowledge which actually formed the basis for the improper rates, Plaintiffs could have determined that the rates were improperly derived and filed appropriate objections. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs and all other similarly situated rate-paying customers of Recology suffered economic injuries while Defendants have profited from their unlawful, unfair, and fraudulent acts and practices.

216.    Plaintiffs and all other similarly situated rate-paying customers of Recology are entitled to restitution pursuant to Business & Professions Code §§ 17203 and 17208 from four years prior to the filing of this action to the date of such restitution, and Defendants should be required to disgorge all funds and monies to account for all of Plaintiffs' and Class members' losses. In other words, Plaintiffs and Class members have a vested ownership interest in the funds and monies that were unlawfully, unfairly, and fraudulently obtained from them and retained by Defendants.

217.    Injunctive relief is necessary and appropriate to prevent Defendants from continuing and repeating their unlawful, unfair, and fraudulent business acts and practices as alleged above.

218.    Plaintiffs have assumed the responsibility of enforcement of the laws and public policies specified herein by suing on behalf of themselves and all other similarly situated members

of the public who are or previously were customers of Recology in the City and County of San Francisco. Plaintiffs' success in this action will enforce important rights affecting the public interest. Plaintiffs will incur a financial burden in pursuing this action in the public interest. Therefore, an award of reasonable attorneys' fees to Plaintiffs is appropriate pursuant to Code of Civil Procedure § 1021.5.

219.    Plaintiffs and all other similarly situated rate-paying customers of the City and County of San Francisco request relief as described below.

## <u>SECOND CAUSE OF ACTION</u>
### Fraud
**(Plaintiffs Individually and on Behalf of the Class Against all Defendants)**

220.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-219 above, as though fully set forth herein.

*Intentional Misrepresentation*

221.    The entire San Francisco Bay Area, and specifically San Francisco, has long been known, at least since the 1960s, as a hotbed of political activism and consumer awareness. This reputation is nationwide and persists to this day.

222.    San Francisco has become increasingly known in recent years as a residential area for many workers, executives and entrepreneurs in technological companies, many of whom work with computers and the internet and are active consumers of social media.

223.    San Francisco's population is, on the average, better educated than the population of other comparable metropolises in the United States.

224.    As a company with major operations in San Francisco, Recology is well aware of these facts and has long been aware of the risk of scandal should it engage in improper activities toward San Francisco's ratepayers, a group that has a reputation as being more politically aware and informed than average ratepayers in the United States.

225.    Further, because Recology partnered in the bribery scheme with a high-ranking official of the City of San Francisco, along with other City officers who participated, Recology and its partners were acutely vulnerable to political pressure.

226.    Recology knew from the beginning of the pertinent period that the ratemaking process was tainted with fraudulent concealment of information, corruption and bribery, producing an unjust and unreasonable result in the form of artificially and unreasonably high waste collection rates. Recology therefore intentionally misrepresented to the ratepayers and intentionally renewed its misrepresentation with each billing statement as part of ongoing scheme to intentionally keep its bribery and corruption secret from ratepayers.

227.    Specifically, Recology's billing communications to ratepayers represented that collection services "are subject to the same fixed rate pursuant to initiative ordinance."

228.    The ordinance that drives the ratemaking process and therefore the ordinance that Recology's billing communications to ratepayers clearly and unambiguously referred to was the Refuse Collection and Disposal Ordinance, adopted November 8, 1932 and found at https://sfpublicworks.org/sites/default/files/2063-1932%20Ordinance.pdf.

229.    Section 6 of the Ordinance, the section dealing with ratemaking, states that San Francisco's Director of Public Works—in this case, Nuru—when presented with an application for an increase in waste disposal rates "shall make such order, to take effect at such time, as may be just and reasonable." Ratepayers who were informed and engaged with current events and/or politics and/or the law therefore drew the reasonable inference that the rates were set by a just and legal process in a reasonable method, and Recology expected and intended this to happen when crafting the subject billing statements. Recology also knew that these informed and engaged ratepayers were also the persons who were most likely to protest, take legal action, and/or engage in the legal process in an attempt to gain redress and learn the truth.

230.    This implied statement was false, as Recology knew that the ratemaking process was tainted with fraudulent concealment, corruption and bribery, producing an unfair result and artificially high waste collection rates. This statement was likely to mislead a reasonable consumer so long as the consumer remained unaware of the underlying corruption.

231.    Recology crafted this billing communication as an attempt to keep consumers unaware of the underlying corruption.

232.    Plaintiffs read the billing communications, as did members of the class, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing.

233.    All Plaintiffs, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing, were mollified by the false and misleading statements in the billing communication and lulled into failing to make further inquiries that could have led to discovery of the underlying corruption.

234.    All Plaintiffs, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing, relied on and were mollified by the concealment of true facts from the billing communication and lulled into failing to make further inquiries that could have led to earlier discovery of the underlying corruption.

235.    Ratepayers in the City and County of San Francisco relied on Recology's representations that the garbage rates are just and reasonable and set with oversight by the City to insure that the rates are not wrongly inflated.

236.    With each monthly billing statement to ratepayers, Recology renewed its representation that collection services "are subject to the same fixed rate pursuant to initiative ordinance," continually implying that the rates had been fixed by a "just and reasonable" process. This representation to ratepayers was renewed monthly with each periodic bill sent to consumers throughout the pertinent period.

237.    Plaintiffs and members of the class read the representations each time.

238.    Recology reasonably believed that Ratepayers, who are subject to Recology's monopoly, understood the implied representation that rates are set by a just and reasonable process and Recology therefore intentionally used this language to aid its ongoing efforts to conceal from ratepayers the unlawful, unfair and fraudulent acts, communications and knowledge which actually

1  formed the basis for the improper rates.

2      239.    Recology reasonably believed that ratepayers would rely on the implied statement

3  that rates were set by a just and reasonable process and that their reliance would prevent them from

4  inquiring into the details of how rates were set or from attempting to arouse public awareness

5  and/or discontent with the ratemaking process or rate levels, as well as from suing Recology for

6  its duplicitous statements and actions, or from engaging in the political process to create pressure

7  on Recology and its partners in the City to charge rates that were just, reasonable and fair instead

8  of elevated rates procured by bribery and corruption.

9      240.    In fact rates were not set by a just and legal process in a reasonable method but

10  were procured through bribery and corruption.

11      241.    Recology intended that ratepayers should continually rely on the renewed

12  statements in its billing communications by continuing to pay their bills without initiating inquiries

13  to, for example, Recology, the City, law enforcement agencies, or consumer representatives and

14  without suing Recology or using political communication and other techniques to create and

15  continually increase political pressure on Recology and its partner in the bribery scheme, the City

16  and City officers.

17      242.    Plaintiffs did indeed continually read the billing communications, as did members

18  of the class, including those informed and engaged class members who would be likely to object

19  through legal channels and/or engage in the political process should they learn that their rates were

20  set through wrongdoing.

21      243.    Ratepayers thus continued to reasonably rely on Recology, who has the monopoly

22  waste collection service for the City and County of San Francisco and is regulated by the City, to

23  truthfully present them with just and reasonable bills determined by a just and reasonable

24  ratemaking process, and because of their reliance paid their waste collection bills without protest

25  or inquiry and did not initiate legal process

26      244.    But for Recology's continued intentional misrepresentation, along with its

27  continued concealment of the fact that the rates were not set through a just and legal process in a

28

reasonable method, Plaintiffs would have been able to object to the improper rates, or alternatively would have engaged in the political process to seek redress, and would have done so in sufficient numbers to effectively end the practice and begin the process of bringing Recology to justice. Recology's false statements and concealment injured plaintiffs by depriving them of knowledge that would have enabled them to take ameliorative actions against the illegal rate increases.

245.    The bribery scandal finally actually came to the public's attention when Giusti was arrested on November 18, 2020. Only 3-1/2 months later, on March 4, 2021, Recology and the City announced that the City's investigation of the affair had concluded that Recology would make a $95 million payment to the City, to be disbursed to ratepayers.

246.    Plaintiffs could and would have brought this scandal to the public's attention years earlier if not for Recology's misrepresentations and concealment alleged herein. Earlier publicity of the scandal at any time would have led to its swift end, just as it in fact did when the scandal eventually made headlines in 2020.

247.    It was only because of Plaintiffs' reasonable reliance that Recology was able to maintain the illegal scheme over a course of years. The fact that the City launched a prompt investigation once the scheme became publicly known and then rapidly came to an agreement with Recology whereby Recology would end its improper actions and provide some amount of compensation to ratepayers for its past wrongdoing is strong evidence that it was only the secrecy of the scheme that allowed it to continue and flourish for years.

248.    But for Recology's continuing concealment of the fact that elevated waste management payments were obtained by bribery, the bribery and elevated waste management payments would have ceased within a short payment of time after the concealment ended. Had the obtainment of elevated waste management rates by bribery not been intentionally and continually concealed, the secret scheme would never have been effective and ratepayers would either have never paid the elevated rates at all or only paid them for a short period of time before they ended.

249.    Ratepayers were harmed by being forced to pay during those years by paying inflated waste collection bills throughout the pertinent period.

250. Ratepayers' reliance on the statement in the billing materials was a substantial factor in their harm because they did not protest the bills as they had no information concerning the facts which Recology intentionally concealed, nor did they have any information regarding Recology's bribery of the individual responsible for approving the rates. Therefore the practice of presenting inflated bills to consumers was allowed to continue unabated.

*Fraudulent Concealment*

251. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-251 above, as though fully set forth herein.

252. Recology had a duty to inform Plaintiffs of its knowledge that was material to Plaintiffs' payment of the unjust, unreasonable and unfairly elevated rates set by the 2017 ratemaking process because:

a. Plaintiffs engaged in a direct transaction with Recology by paying Recology for waste disposal services.

b. Recology repeatedly represented certain facts to Plaintiffs, to wit, that waste collection rates were set by ordinance, and those facts had a tendency to mislead Plaintiffs into believing that rates were set by a just and reasonable process, all while Recology intentionally did not disclose to Plaintiffs that it knew that the ratemaking process was corrupted and unfair and that Recology was in fact purchasing higher waste collection rates with bribes. These misleading facts which led Plaintiffs to believe that rates were set by a just and reasonable process were disclosed monthly with each new bill throughout the pertinent period, and each time Recology once again intentionally failed to disclose its secret knowledge which would have materially qualified the disclosed facts.

c. Recology was aware throughout the pertinent period that it was purchasing higher waste collection rates with bribery and corruption and intentionally kept these facts secret. Plaintiffs were unaware of this and could not have learned it by reasonable efforts, and Recology never informed the ratepayers of such until ratepayers had already been informed by newspaper headlines.

253.    Recology intended to conceal from ratepayers the fact that it was purchasing higher rates with bribery and corruption in order that ratepayers should continue to pay their bills without initiating inquiries to, for example, Recology, the City, law enforcement agencies, or consumer representatives, and without filing a lawsuit or organizing a political protest.

254.    But for Recology's concealment of the unlawful, unfair and fraudulent acts, communications and knowledge which actually formed the basis for the improper rates, Plaintiffs could have objected to the improperly set rates, filed a lawsuit, or could have taken other steps to attempt to seek justice and fair rates.

255.    Ratepayers were harmed by being forced to pay inflated waste collection bills throughout the pertinent period without their knowledge that they were doing so because of Recology's misleading statements and concealment.

*Intentional Indirect Misrepresentation*

256.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-256 above, as though fully set forth herein.

257.    Recology made representations to the Rate Board during the 2017 ratemaking process regarding its costs, expenses, or other components of proper rates that were false and misled the board into approving higher waste collection rates, while at the same time concealing the unlawful, unfair and fraudulent acts, communications and knowledge which actually formed the basis for the improper rates. The substance of Recology's representations to the Rate Board was that proper, just and reasonable rates should be at a certain level. That representation was false, and Recology knew it was false because Recology knew that the certain level of rates that Recology represented to be the proper level constituted a higher rate level than would have been set if Recology had made truthful representations to the Rate Board during its 2017 ratemaking as to its costs, expenses, and/or other components of proper rates.

258.    Recology made these false representations to the Rate Board with the intent that the Rate Board would repeat the substance of their representations, namely, that the proper level of rates was the high level Recology desired them to be set at.

259.    Recology intended and believed that ratemakers would accept and rely upon its representations, conveyed through the Rate Board.

260.    By setting rates at the level desired by Recology, the Rate Board repeated to ratepayers, including Plaintiffs, the substance of the representations made by Recology, namely that the proper level of rates was the level desired by Recology, when Recology knew the rates were artificially inflated due to information it concealed and bribes made to City officials.

261.    Ratepayers including Plaintiffs reasonably relied on the repeated representations by the Rate Board of the substance of Recology's representations to the board, namely, that the corruptly inflated rates they had to pay were the proper rate level set by a just and reasonable process, as ratepayers were intended to do by Recology.

262.    Plaintiffs received and read their waste management bills with the understanding that the rates on those bills were set by a just and reasonable process and a reasonable method. Plaintiffs reasonably relied upon and believed the repeated representations by the Rate Board because they reasonably believed that the Rate Board operated with the purpose of setting just and reasonable rates through a fair and legal process and was therefore trustworthy. Ratepayers were thereby misled to believe the substance of Recology's representations to the Board, namely, that the high rates they had to pay were the proper rate level, as intended by Recology.  But for those representations, ratepayers could have initiated inquiries to, for example, Recology, the City, law enforcement agencies, or consumer representatives, or brought suit against Recology or engaged in the political process.

263.    As a result, ratepayers were harmed by being forced to pay inflated waste collection bills throughout the pertinent period. Because ratepayers were unaware that they were being harmed, they had no method of allaying or ending their ongoing injury.

264.    Plaintiffs and all other similarly situated rate-paying customers of the City and County of San Francisco request relief as described below.

///

///

FOURTH AMENDED CLASS ACTION COMPLAINT

**THIRD CAUSE OF ACTION**
**Violation of the Consumer Legal Remedies Act**
**(Plaintiffs Individually and on Behalf of the Class Against all Defendants)**

265.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-265 above, as though fully set forth herein.

266.    Recology's billing communications to ratepayers represent that collection services "are subject to the same fixed rate pursuant to initiative ordinance."

267.    This implied statement was false, as the ratemaking process was tainted with fraudulent concealment, corruption and bribery, producing an unfair result and artificially high waste collection rates. This statement was likely to mislead a reasonable consumer.

268.    Plaintiffs read the billing communications, as did members of the class, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing.

269.     All Plaintiffs, including those informed and engaged class members who would be likely to object through legal channels and/or engage in the political process should they learn that their rates were set through wrongdoing, read, relied on, and were mollified by the false and misleading statements in the billing communication and lulled into failing to make further inquiries that could have led to discovery of the truth.

270.     The ordinance that Recology's billing communications to ratepayers clearly referred to was the Refuse Collection and Disposal Ordinance, adopted November 8, 1932 and found at https://sfpublicworks.org/sites/default/files/2063-1932%20Ordinance.pdf.

271.    Section 6 of the Ordinance, the section dealing with ratemaking, states that San Francisco's Director of Public Works—in this case, Nuru—when presented with an application for an increase in waste disposal rates "shall make such order, to take effect at such time, as may be just and reasonable." Ratepayers who were informed and engaged with current events and/or politics and/or the law read the billing statement and drew the reasonable inference that the rates were set by a just and legal process in a reasonable method. These informed and engaged

ratepayers were also the persons who were most likely to protest, take legal action, and/or engage in the legal process in an attempt to gain redress and learn the truth.

272.    In fact rate were not set by a just and legal process in a reasonable method but were procured through bribery, as Recology knew. But for Recology's concealment of the facts that the rates were not set through a just and legal process in a reasonable method Plaintiffs would have been able to object to the improper rates, or alternatively would have engaged in the political process to seek redress, and would have done so in sufficient numbers to effectively end the practice and begin the process of bringing Recology to justice. Recology's false statements and concealment injured plaintiffs by depriving them of knowledge that would have enabled them to take ameliorative actions against the illegal rate increases.

273.    The bribery scandal came to the public's attention when Giusti was arrested on November 18, 2020. Only 3-1/2 months later, on March 4, 2021, the City's Recology and the City announced a $95 million payment from Recology to the City, to be disbursed to ratepayers, after the City's investigation of the affair concluded.

274.     Plaintiffs could and would have brought this scandal to the public's attention years earlier if not for Recology's misrepresentations and concealment alleged herein. Earlier publicity of the scandal at any time would have led to its swift end, just as it in fact did when the scandal eventually made headlines in 2020.

275.    Plaintiffs read and reasonably relied on these representations and concealments in deciding to pay their bills without attempting to end the improperly elevated rates through protest, objection, use of the legal process, or engagement in the political process. It was only because of Plaintiffs' reliance that Recology was able to maintain the illegal scheme over a course of years.

276.    But for Recology's concealment of the fact that elevated waste management payments were obtained by bribery, the bribery and elevated waste management payments would have ceased within a short payment of time after the concealment ended. Had the obtainment of elevated waste management rates by bribery not been intentionally concealed, the secret scheme

would never have been effective and ratepayers would either have never paid the elevated rates at all or only paid them for a short period of time before they ended.

277.    Plaintiffs read and read and reasonably relied on these representations and concealments in deciding to pay their bills without attempting to end the improperly elevated rates through protest, objection, use of the legal process, or engagement in the political process. It was only because of Plaintiffs' reliance that Recology was able to maintain the illegal scheme over a course of years.

278.    But for Recology's concealment of the fact that elevated waste management payments were obtained by bribery, the bribery and elevated waste management payments would have ceased within a short payment of time after the concealment ended. Had the obtainment of elevated waste management rates by bribery not been intentionally concealed, the secret scheme would never have been effective and ratepayers would either have never paid the elevated rates at all or only paid them for a short period of time before they ended.

279.    Recology was aware that it was purchasing higher waste collection rates with bribes, and Plaintiffs were unaware of this and could not have learned it by reasonable efforts.

280.    The implied statement that rates were set by a just and reasonable process was false, as the ratemaking process was tainted with fraudulent concealment, corruption and bribery, producing an unfair result and artificially high waste collection rates. This statement was likely to mislead a reasonable consumer. Recology represented it to be a truthful statement.

281.    But for the statement, and Recology's concealment of information concerning just and proper rates, Plaintiffs would have been informed of what would constitute proper collection rates, would have known that the implied statement Recology had made to them via its billing communications had been false, and would have been afforded an opportunity to object to, or otherwise engage and oppose, the improperly elevated rates.

282.    Recology failed to ensure that the language in its billing communications to ratepayers was accurate throughout the pertinent period, although it was, in fact, inaccurate and

likely to mislead a reasonable consumer, or a reasonable group of consumers, and Recology could easily have cured this.

283.    Recology intentionally promulgated billing statements containing language that, combined with the 1932 ordinance, implied that rates were "just and reasonable" and set by an orderly and legal process.

284.    Recology intended that ratepayers should rely on the statements by continuing to pay their bills without initiating inquiries to, for example, Recology, the City, law enforcement agencies, or consumer representatives.

285.    Ratepayers reasonably relied on Recology as the monopoly waste collection service for the City and County of San Francisco to truthfully present them with fair and accurate bills determined by a fair and legal ratemaking process.

286.    Ratepayers were harmed by being forced to pay inflated waste collection bills throughout the pertinent period because of Recology's failure to insure statements about how the rates were derived were accurate and Recology's intentional promulgation of inaccurate statements about how the rates were derived.

287.    Ratepayers' reliance on the statements was a substantial factor in their harm because they did not protest the bills and therefore the practice of presenting inflated bills to consumers was allowed to continue unabated.

288.    But for Recology's statements, Plaintiffs would not have been harmed repeatedly on a month-by-month basis over a period of years.

289.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent acts and practices described herein, Defendants, and each of them, received and continue to hold ill-gotten gains belonging to Plaintiffs and all other similarly situated rate-paying customers of Recology.  As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs and all other similarly situated rate-paying customers of Recology suffered economic injuries while Defendants have profited from their unlawful, unfair, and fraudulent acts and practices.

290.    Plaintiffs and all other similarly situated rate-paying customers of Recology are entitled to restitution pursuant to Business & Professions Code §§ 17203 and 17208 from four years prior to the filing of this action to the date of such restitution, and Defendants should be required to disgorge all funds and monies to account for all of Plaintiffs' and Class members' losses. In other words, Plaintiffs and Class members have a vested ownership interest in the funds and monies that were unlawfully, unfairly, and fraudulently obtained from them and retained by Defendants.

291.    Injunctive relief is necessary and appropriate to prevent Defendants from continuing and repeating their unlawful, unfair, and fraudulent business acts and practices as alleged above.

292.    Plaintiffs and all other similarly situated rate-paying customers of the City and County of San Francisco request further relief as described below.

## FIFTH CAUSE OF ACTION
### Negligence

293.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-293 above, as though fully set forth herein.

294.    Before 2009, Recology was known as Norcal Waste ("Norcal").

295.    In 1998, San Bernardino County Administrative Officer James Hlawek resigned. He subsequently cooperated with local and federal investigators looking into a conspiracy wherein Hlawek and several other County officers pled guilty to receiving substantial payments as part of a conspiracy with a Norcal vice president to steer the county's landfill contracts to Norcal.

296.    In 2007, Norcal was indicted, along with former San Jose Mayor Ron Gonzales, in connection with an allegation that Gonzales and other public officials had steered over $11 million in public money to Norcal in exchange for having Norcal's recycling subcontractor become a union stop for the Teamsters, a contributor to Gonzales' campaigns. On information and belief the indictment was dismissed because primarily prosecuting an official on that theory threatened the First Amendment rights of constituents, and not on any factual basis.

///

297.   Because of these and other events, Recology had an institutional memory of the impact that corruption and bribery in the sphere of municipal politics and governance before the events that are the subject of this lawsuit occurred, and had been made aware of the legal, economic and moral consequences of such acts. Recology had been named in headlines alleging bribery of municipal officials by its officers on at least the occasions mentioned above. Under the circumstances, Recology understood that bribery of municipal officials by its officers was reasonably foreseeable, and that it therefore had a duty of care to take the acts that a reasonable person would take to prevent such bribery of municipal officials by its officers, along with resulting harm.

298.   Recology breached this duty by failing to take the acts that a reasonable person would take to prevent such bribery of municipal officials by its officers.

299.   On information and belief, Recology did not effectively train its officers and employees, including Giusti, to refrain from making improper gifts and bribes to public officials.

300.   On information and belief, Recology did not promulgate and make known to its officers and employees effective policies forbidding such improper gifts and bribes, or alternatively made such policies known and failed to reasonably enforce them.

301.   San Francisco Campaign and Governmental Conduct Code Section 3.216(a) states that, "[n]o person shall offer or make, and no officer or employee shall accept, any gift with the intent that the City officer or employee will be influenced thereby in the performance of any official act."

302.   Harm to the City's residents stemming from bribery of City officers or employees is the evil that Section 3.216(a) was intended to allay.

303.   The City's residents were the class of persons that Section 3.216(a) was intended to protect.

304.   Plaintiffs were residents of the City during the pertinent period.

305.   Because harm to the City's residents stemming from bribery of City officers or employees is the evil that Section 3.216(a) was intended to allay, and because the City's residents

were the class of persons that Section 3.216(a) was intended to protect, Recology's failure to prevent bribery of City officers or employees by its own officers and agents implicates the negligence per se doctrine, creating a duty of due care in Recology to ensure that Plaintiffs and the class were not harmed by Recology's bribery of City officers or employees through its own officers and/or agents.

306.    Since at least 2017, Recology's officers have engaged in a pattern of making direct and indirect monetary and in-kind gifts to City officers and employees with the intent to curry favor and influence governmental decisions in violation of Section 3.216(a).

307.    Recology's officers and employees have laundered monetary and other gifts to City employees through charitable contributions to non-profit organizations.

308.    Recology's officers and employees have funded a lavish holiday party for City employees.

309.    Recology's officers and employees have provided meals and accommodations and other items and services of value to City officials and their families with the intention of influencing City employees engaged in regulating Recology.

310.    As a proximate result of Recology's breach of the duty of due care, its officers and employees' unlawful gifts to City officers and employees continued and residential waste management rates were elevated by an improper amount during the 2017 ratemaking, harming Plaintiffs and the Class, who were residents of the City.

311.    Recology negligently failed to take reasonable steps to prevent its officers and employees from violating Section 3.216(a), breaching the duty of care they owed to Plaintiffs and the class, including by providing adequate training to its officers and employees to prevent bribery and/or by enacting appropriate and effective policies to prevent bribery.

312.    Because harm to the City's residents and to good governance stemming from bribery of City officers or employees is the evil that Section 3.216(a) was intended to allay, and because ratepayers were City residents and therefore among the class of persons that Section 3.216(a) was intended to protect, Recology's officers and employees, acting on Recology's behalf,

breached the duty of care they owed to Plaintiffs and the class when they negligently failed to prevent their officers and employees from enacting a scheme of bribery and money laundering in order to obtain higher waste management rates.

313.     Ratepayers were harmed financially by the breach which caused them to pay inflated waste collection rates during the years subsequent to the 2017 ratemaking and this harm was proximately caused by Recology's breach of the duty of care in failing to prevent its officers and employees from making unlawful gifts to City officers and employees in violation of Section 3.216(a).

314.     Plaintiffs and all other similarly situated rate-paying customers of the City and County of San Francisco request relief as prayed below.

### SIXTH CAUSE OF ACTION
### Civil RICO Violations

315.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-315 above, as though fully set forth herein.

316.     Plaintiffs allege that Recology committed and/or engaged in acts denominated as unlawful predicate offenses pursuant to the RICO Act, including bribery (18 U.S.C. § 666(a)(2)), concealment money laundering (18 U.S.C. § 1956(a)(1)(B)(i)), and wire fraud (18 U.S.C. § 1343).

*The Enterprise*

317.     An enterprise (the "Enterprise") was formed based on an agreement to participate in an endeavor which, if completed, would constitute a violation of the RICO Act. Specifically, the Defendants conspired to form the Enterprise for the purpose of unlawfully performing bribery, concealment money laundering, and corruption of a public official for the purpose of facilitating the operation of, and preventing the detection of, a long-running pattern of bribes given to and favors performed for City of San Francisco (the "City") officials, which bribes and favors were intended to induce the former Director of the San Francisco Department of Public Works ("DPW") Mohammad Nuru ("Nuru") to use his position with the City to improperly raise the garbage rates on the ratepayers to financially benefit the Enterprise. Nuru was the individual primarily

responsible for approving Recology's requests for waste management rate increases. The scheme worked as intended, and Nuru was instrumental in wrongfully approving improper rate increase requests which allowed Recology to unlawfully and improperly obtain elevated rates for waste collection in San Francisco over a period of several years, amounting in total to a very large sum of wrongful financial gains amounting to at least $120 million and likely more.

318.    The following named individuals and/or entities were part of the Enterprise: Recology; Paul Giusti ("Giusti"), Group Government and Community Relations Manager for Recology, whose job duties, as shown herein, included doing whatever was necessary to keep Nuru happy; Nuru; Nick Bovis ("Bovis"); the Lefty O'Doul Foundation for Kids. The Enterprise likely included other persons not yet discovered and not named here.

319.    Recology acted primarily through Giusti, who in turn acted on behalf of Recology in his capacity as an officer of Recology. Recology, through Giusti and of Recology's agents, provided direction to the Enterprise such that the whole enterprise acted on behalf of Recology.

320.    As detailed herein, Recology's scheme to, through the illegal and corrupt actions of its officers, agents and executives, keep Nuru happy and thereby reap illegal and corrupt income based on illegally elevated waste management rates, was an ongoing and continuous criminal Enterprise throughout the pertinent period. The scheme, which was effectuated by the predicate acts detailed herein, was a regular part of Recology's way of doing business throughout the pertinent period

321.    In directing the Enterprise, Giusti acted on behalf of Recology and in his capacity as Group Government and Community Relations Manager for Recology.

322.    The Enterprise also included these individuals: Department of Works Deputy Director A; Recology Executive 1; Recology Executive 2; Recology Executive 3; Recology San Francisco General Manager A; another unknown person or other unknown persons who exercised substantial authority over decisions that ultimately determined Recology's corporate policy; Recology Assistant A; Non-Profit A; Non-Profit B, and Non-Profit C. Other persons not known to Plaintiffs at this time may also have contributed to the efforts and successes of the Enterprise.

323.    The Enterprise was directed by Giusti and/or Recology Executive 3 and/or another unknown person or other unknown persons who, like Giusti and Recology Executive 3, exercised substantial authority over decisions that ultimately determined Recology's corporate policy and who acted on behalf of Recology. Giusti and/or Recology Executive 3 acted for Recology within the scope of their employment and in furtherance of Recology's business interests in directing the Enterprise.

324.    Recology benefited from the actions of the Enterprise by obtaining inflated revenues from the ratepaying residents of San Francisco. Recology was thus enabled to invest the inflated and wrongfully-earned excess revenues in physical plant including but not limited to recycling facilities, in Recology's affiliates in Washington and Oregon, and in increased salaries, advertising, executive bonuses and/or other areas wherein such investment accrued to the benefit of the entire organization and its owners, including in its facilities and operations in states other than California.

325.    The Enterprise successfully directed, organized, and perpetrated, or caused to be directed, organized, and perpetrated bribery, concealment money laundering, and corruption of a public official, as detailed herein. The Enterprise did these acts for the purpose of facilitating the operation of, performing, and preventing the detection of, a long-running pattern of bribes of City of San Francisco (the "City") officials, which bribes allowed Recology to unlawfully and improperly obtain elevated rates for waste collection in San Francisco.

326.    Recology, through its officers and agents, knowingly agreed to facilitate and direct said bribery, concealment money laundering, and corruption of a public official by, *inter alia*, ordering or knowingly allowing said crimes to be performed and also by providing management expertise and necessary funding.

327.    Recology, and not any natural person, was both a member of the Enterprise and the driving force and director of the Enterprise.

328.    On information and belief, a hearing took place in the District Court for the Northern District of California on October 17, 2024 wherein a bribery charge against Recology

was dismissed because Recology had satisfied the terms of its deferred prosecution agreement. On information and belief, at the hearing, Judge William Orrick, while granting the motion, said that he "wanted to underscore for you and emphasize how corrupt the practice was that led to the criminal charges, and how skeptical I am that the criminal conduct within Recology didn't go higher than Mr. Giusti and Mr. Porter. I don't believe that."

*The Pattern of Racketeering Activity*

329.    As detailed herein, this pattern of racketeering activity consisted of numerous acts over the course of six or more years, including bribery, concealment money laundering, wire fraud, and corruption of public officials.

330.    As also detailed herein, Recology invested well over one million dollars in racketeering by the Enterprise, and its profits were exponentially greater than that amount.

331.    Recology was therefore a full member of the Enterprise engaged in racketeering practices and related actions of bribery, and also the director and managing force of the enterprise, and reaped an amount of wrongfully obtained rates paid by plaintiffs that constituted a major portion of Recology's revenues. Thus bribery and racketeering were a major component of Recology's regular way of conducting business during the pertinent period.

332.    As detailed herein, Recology enacted several smaller schemes of bribery, improper and illegal gifts and influence peddling. These individual schemes were all coordinated parts of an overall scheme, lasting for years, to intentionally corrupt Nuru's with financial largesse and thereby to obtain, and force plaintiffs to pay, wrongfully and illegally elevated waste management rates.

*Predicate Acts*

333.    Recology committed predicate acts by and through its offices and employees as detailed herein.

*Bribery Pursuant to 18 U.S.C. § 666(a)(2)*

334.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-334 above, as though fully set forth herein.

335.    As recounted *supra*, Recology, acting through its officers, employees and agents, committed numerous acts of bribery of local officials of the City of San Francisco with corrupt intent.

336.    The City of San Francisco received far more than $10,000 in federal assistance each year during the pertinent period. For example, on information and belief, in 2018 San Francisco received a $9.2 million federal grant to modernize the Presidio Yard bus maintenance facility, a $53 million grant to support homelessness programs, $60 million in federal tax credits to support nonprofits and businesses in low-income community and an unknown amount in wildfire recovery efforts.

337.    For another example, on information and belief, San Francisco received a $600 million federal Affordable Housing Bond in 2019. San Francisco's Department of Homelessness and Supporting Housing and its Department of Public Health also, on information and belief, received federal assistance in excess of $10,000.

338.    For another example, on information and belief, San Francisco received over $1 billion in federal funding in 2020, including funding from the CARES act, which allocated federal coronavirus relief funds to state and local governments.

339.    Recology, with corrupt intent and acting through its officers and agents, gave Nuru, in his capacity is the agent of a local government, money well in excess of $5,000 and laundered through non-profit agencies, on numerous occasions in connection with a business, transaction or series of transactions—namely, Recology's 2015, 2017 and other applications for waste management rate increases--involving value far above $5,000 and in fact at least $120 million, and not as a bona fide salary, wage, fee, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

340.    Recology agreed in January 2013 to donate $80,000 to Giant Sweep, an anti-litter volunteer program created in honor of the San Francisco Giants' sweep of the Detroit Tigers in the 2012 World Series.

///

341.   DPW hosted a number of Giant Sweep events from 2013 until about 2018.

342.   The original donation was closely tied to Recology's 2013 rate increase application and began with Recology's agreement to give Nuru $100,000 a year for Giant Sweep in January 2013, during the rate increase application process.

343.   Recology paid $40,000 to Non-Profit A on or around February 14, 2013, 3 days after DPW notified Recology that its draft application was complete.

344.   Recology had contributed a total of $80,000 to Non-Profit A for Giant Sweep by the time Nuru issued his final report in June 2013, approving Recology's requested rate increase.

345.   Between February 2013 and November 2019, Recology made 35 payments totaling over a million dollars to keep Nuru happy. The payments were laundered through Non-Profit A as Giant Sweep donations.

346.   Giusti arranged for these payments at the direction of Nuru and Non-Profit A to influence Nuru's actions as a regulator with corrupt intent. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

347.   In the spring of 2015, Recology began preparing its next rate increase application. At the time, Recology's plan was to file a Notice of Intent on July 2, 2015.

348.   Nuru was scheduled to meet with Giusti and Recology Executive 2 on March 25, 2015 to discuss "Updates re: Rate Application/New Facilities."

349.   On May 20, 2015, Non-Profit A's Executive Director wrote to Giusti and Recology Assistant A, "We did not receive the Giant Sweep donation for May? Please advise."

350.   Within minutes, Giusti and Recology Executive 1, two persons in leadership positions at Recology, were emailing each other and others within Recology, urgently trying to find out what happened to the payment and arranging for a check to be cut and mailed as soon as possible.

///

351.    Giusti wrote to Recology Executive 1 and others, "Can you let us know when the check will be cut. This is embarrassing and is the second check just today alone that has come to the DPW Directors attention where we have failed to meet our payment commitment."

352.    About fifteen minutes later, at approximately 12:26 p.m., Giusti wrote only to Recology Executive 1, "I got my ass chewed out this morning from Mohammed and actually had to promise to write a personal check to a non-profit that has been waiting months to get paid!" Recology Executive 1 wrote back to Giusti about ten minutes later, "We should sit down and discuss all the politically sensitive payments that we make on a recurring basis so that we can check to ensure that those are paid regularly." Giusti replied, "Not paying our commitments timely negates all the good will we build by making the donation/sponsorship in the first place."

353.    Approximately one hour later, Recology Executive 1 himself prepared, signed and emailed a check request form for the $30,000 payment to Non-Profit A, with a note indicating, "Please pay as soon as possible." He sent it to the accounts payable supervisor, asking her, "Can you pay off of this? If so, when can you pay? If not, let me know what we need to do. Our office is closed, [Recology Executive 2] is on vacation and this needs to be paid as soon as possible."

354.    Recology Executive 1 also forwarded Giusti's 12:26 p.m. email about his encounter with Nuru to the Assistant Corporate Controller of Recology. He wrote, "FYI – Mohammed is the Director of the DPW who ultimately signs off on our rates. Needless to say, keeping him happy is important."

355.    On information and belief, in taking the actions alleged here as occurring on May 20, 2015, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology and Recology Executive 1 also acted for Recology in his or her official activity. Both Giusti and Recology Executive 1 acted at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

356.    In June 2015, while Recology was preparing to submit the Notice of Intent for its planned rate increase application, Giusti arranged for Recology to hire NURU's son. On the morning of June 17, 2015, Giusti, acting for Recology in his official capacity, and at the behest of

officers and executives of Recology with authority to make decisions for the entity as a whole, met with Recology SF General Manager A to discuss the schedule for the upcoming rate increase application. That afternoon, Giusti forwarded Nuru's son's cell phone number to a Human Resources employee at Recology, telling her, "This is what I got from Mohammed." A few hours later the Human Resources employee advised Giusti that she would call Nuru's son and connect him with Recology's staffing agency.

357.    The next morning, on June 18, 2015, Recology Executive 1, acting for Recology in his or her official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, sent the draft schedule for the rate application process to Nuru's immediate subordinate at DPW.

358.    The next evening, on June 19, 2015, the Human Resources employee sent Giusti an email with high importance, advising that she had contacted NURU's son again and he had completed the staffing agency paperwork that day and just needed to complete his work permit before he could start. On information and belief, in taking these actions regarding Nuru's son, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole. Recology and Giusti took these acts with the corrupt intent of keeping Nuru happy through improper payments to his family and in order to fraudulently obtain improperly elevated waste management rates.

359.    NURU's son began working at Recology as a temporary laborer on or around June 22, 2015, painting debris boxes. He left to return to school in or around August 2015.

360.    On August 10 and 11, the manager of the Recology unit where NURU's son worked paid almost $900 to Costco and Toto's Pizzeria for "going away lunch supplies for [Nuru's son] and drivers appreciation."

361.    In September 2015, Recology hired NURU's son again. He worked part-time during the 2015-2016 school year, and again during the summer of 2016 after he graduated from high school.

362.    From February 2016 through the end of summer 2016, Nuru's son was the only temporary worker supplied by the staffing agency to Recology.

363.    In 2016, Giusti indirectly arranged for Recology to pay a $3,500 mortuary bill for a deceased DPW employee. Recology paid the mortuary bill after Non-Profit A invoiced Recology $3,500 for a "Donation for DPW Partnership." On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole. These acts were taken with the corrupt intent of keeping Nuru happy through improper payments aiding his department and one of his employees and in order to fraudulently obtain improperly elevated waste management rates

364.    Giusti insured the mortuary bill was paid.

365.    During 2016, Recology continued to work on its upcoming rate increase application.

366.    On September 2, 2016, Recology sent its Notice of Intent letter to Nuru, advising him that Recology would be submitting a draft rate application in early January 2017. The Notice of Intent triggered the official beginning of the months-long rate increase application process, over which Nuru had significant influence.

367.    On February 10, 2017, Recology submitted its formal rate application.

368.    Nuru then held multiple public hearings in March and April 2017, at which Recology executives including Giusti testified.

369.    On May 12, 2017, Nuru submitted his Report and Recommended Order on Recology's requested rate increase.

370.    In it, Nuru recommended that the Rate Board accept most of the increase that Recology asked for, an average increase of approximately 21 percent. The Social Security cost-of-living adjustment for 2017 was 0.3%, 1/70 of the increase requested by Recology.

///

371.    Giusti then arranged for Recology to fund a summer internship program at Non-Profit C. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole. This act was done with the corrupt intent of keeping Nuru happy through improper payments to his family and in order to fraudulently obtain improperly elevated waste management rates.

372.    The summer intern was NURU's son, who began working at Non-Profit C on June 14, 2017, six days after he was terminated from Recology and the very same day that Nuru responded to the public's objections to his recommendation to approve Recology's rate increase. At the end of that week, on June 19, 2017, the Rate Board adopted NURU's recommendation and approved Recology's request for a rate increase, thus effectuating and fulfilling Recology's corrupt and fraudulent plan.

373.    The hiring was so rapid that Nuru's son did not fill out an employment application until his first day of work, June 14, 2017. Although Nuru's son was working with young children, he did not complete his State of California Live Scan fingerprint check until July 12, 2017, and he did not fill out his W-4 withholding form for a full month, until July 25, 2017. He was paid $18 an hour by Non-Profit C, $2 per hour more than his supervisor for the first month.

374.    Nuru's son was a challenging employee who was not trusted by his co-workers, but he remained the entire summer and Recology paid Non-Profit C's $9,600 invoice for its "Summer Youth Program."

375.    Nuru's son was hired again in summer 2018, and shortly thereafter he was reprimanded for physically harming a child when he "grabbed his arm and twisted it enough that his hand 'cracked.'" Nevertheless, Non-Profit C kept him on, and at the end of the summer Recology paid Non-Profit C's $14,000 invoice for its "Summer Youth Intern Program."

376.    In November 2018 Recology arranged to give $20,000 to Nuru, for Nuru's use in throwing the annual DPW holiday party. Giusti acted for Recology in his official capacity as

Recology's Group Government and Community Relations Manager, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, when he agreed to give the money to Nuru to corruptly influence Nuru's actions as the Director of DPW, specifically his efforts to help Recology implement a price increase on dumping fees, known as "tipping fees," that it charged the City. Nuru and Giusti arranged for Recology's payment to be concealed as a "holiday donation" to the Lefty O'Doul's Foundation for Kids, a non-profit organization for underprivileged children in San Francisco. Giusti then arranged for Recology to issue a $20,000 check to the Lefty O'Doul's Foundation and mailed it to Nuru, who gave it to Nick Bovis, the head of that Foundation.

377.    Bovis used the money to pay for expenses associated with Nuru's holiday party and not for underprivileged children.

378.    This was an increase over Recology's prior $15,000 contributions to Nuru's holiday party and the increase was explicitly tied to the corrupt request for higher tipping fees.

379.    After the payment was arranged, Giusti arranged for a congratulatory dinner at Harris' Restaurant on December 20, 2018, attended by Giusti, Nuru, Recology Executive 1 (who paid the $1,182.23 check), Recology Executive 2, and DPW Deputy Director A. This was an opportunity for Giusti to give Nuru the check directly. On information and belief, Giusti, Recology Executive 1, and Recology Executive 2 attended this dinner in their official capacity as officers of Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

380.    To ensure that Nuru would act in Recology's favor, Giusti arranged for Recology to provide Nuru with a continuous stream of additional money and benefits over a period of several years. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole. This continued bribery of Nuru was done with the corrupt intent of keeping Nuru happy through improper payments to his family and in order to fraudulently obtain improperly elevated

FOURTH AMENDED CLASS ACTION COMPLAINT

1 waste management rates

2     381.   For example, Recology made annual contributions from 2016 to 2019 to pay for

3 the DPW holiday party, disguised as charitable donations to the Lefty O'Doul's Foundation.

4     382.   As described above, Recology funneled approximately $1,000,000 to Nuru during

5 the pertinent period through Non-Profit A and Non-Profit B.

6 *Money Laundering Pursuant to 18 U.S.C. § 1956*

7     383.   Plaintiffs re-allege and incorporate by reference the allegations contained in

8 paragraphs 1-383 above, as though fully set forth herein.

9     384.   As recounted herein, Recology, acting through its officers and agents and through

10 the Enterprise, committed numerous acts of money laundering to conceal the proceeds of unlawful

11 activity, specifically the bribery scheme outlined *supra*.

12     385.   As recounted *supra* and herein, Giusti, acting for Recology in his role as an officer

13 of Recology, laundered the proceeds of unlawful activity, specifically bribe money intended for

14 Nuru, by transferring it on numerous occasions to various non-profit agencies in San Francisco

15 who then provided the money to Nuru or spent it at Nuru's direction.

16     386.   This was done to promote the carrying on of the specified unlawful bribery scheme

17 recounted and described *supra* by concealing the source of the funds provided to Nuru;

18     387.   Acting for Recology, Giusti transferred the proceeds of unlawful activity to non-

19 profit agencies instead of disbursing it directly to Nuru with the express intention of concealing

20 the nature (bribe money) and source (from Recology) and control (by Recology) of Recology's

21 gifts to Nuru by making the proceeds appear to be proper, ethical and legal donations to such

22 agencies.

23     388.   Recology and Giusti knew when Giusti transferred the proceeds of unlawful

24 activity, specifically bribe money intended for Nuru, to non-profit agencies that said proceeds

25 would then be either transferred to Nuru or spent at Nuru's direction.

26     389.   Recology and Giusti knew that the bribe money transferred to the non-profit

27 agencies was the proceeds of the bribery scheme described *supra*.

28

390.    Recology and Giusti knew that Recology made the proceeds available to Giusti for the express purposes of carrying out an illegal bribery scheme and concealing said bribery scheme by laundering its proceeds.

391.    Acting for Recology and intending to further Recology's intent to conceal its payments to Nuru, Giusti transferred the proceeds to various non-profit agencies in San Francisco, knowing that the agencies would provide the money to Nuru or spend it at Nuru's direction to corruptly influence Nuru's official actions.

392.    Recology participated in and directed the money laundering scheme.

393.    Recology also hired and paid Nuru's son for positions he was not well qualified for, as described *supra*, in order to make Nuru happy and, as recounted above, in direct connection with attempts to have rates improved. This was bribery of Nuru laundered through his son in order to conceal the nature (bribe money) and source (from Recology) and control (by Recology) of Recology's gifts to Nuru through his son.

394.    As recounted *supra*, Recology increased its contribution to the DPW holiday party for the explicit reason of obtaining an increased tipping fee. The money was directed through the Lefty O'Doul Foundation to launder the bribe by concealing the nature, source and control of the money, harming ratepayers thereby.

395.    Between February 2013 and November 2019, Recology made 35 payments totaling over a million dollars to Non-Profit A as Giant Sweep donations. These were indisputably money-laundering payments.

396.    Recology, acting through Giusti, arranged for these payments at the direction of Nuru and Non-Profit A to influence Nuru's actions as a regulator. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

397.    Nuru and Non-Profit A arranged for the money to be immediately passed to Non-Profit B, where it was deposited into accounts that NURU used as a slush fund for his professional

benefit. On information and belief, Recology and Giusti were aware of this subsequent transaction, which was done to conceal the nature, source and control of the bribe money.

398.    From 2014-2018 18, Non-Profit A, a 501(c)(3) organization, got 80% of its funding from the City and County of San Francisco. The remainder of its money came mostly from Recology, particularly from 2016-2018.

399.    Multiple text messages from Nuru to Non-Profit A's director instructed him to forward payments Recology had made to Non-Profit A on to Non-Profit B. For example, on or around October 25, 2018, Recology wired $30,000 to Non-Profit A. On November 6, 2018, Non-Profit A's Executive Director texted Nuru, "Hi. Got another GS donation. Should I cut a check to [Non-Profit B]?" Nuru texted back, "Yes."

400.    One of the Non-Profit B accounts was referred to as the "Special Projects" account. Nuru or his close associates approved of all expenditures from the Special Projects account, while Non-Profit B, purportedly the administrator of the accounts, played no role in approving expenditures.

401.    Funds from the Special Projects account were in fact used to pay for deejay services, hats, t-shirts and other merchandise, Bay to Breakers entry fees for DPW employees, mortuary-related expenses, and thousands of dollars to cover the costs of food and other vendors for DPW events, including photo booths, a chocolate dessert fountain, holiday quartets, and specialty lighting for the annual DPW holiday parties.

*Wire Fraud Pursuant to 18 U.S.C. 1343*

402. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-402 above, as though fully set forth herein.

403. The overall and ongoing scheme that is the subject of this action was a scheme, formed and directed by Recology through its officers, employees and agents, to charge improperly and illegally elevated waste management rates to ratepayers. This scheme was a scheme to obtain money by means of false or fraudulent pretenses, representations or promises, including misrepresentations to the Rate Board and intentional concealment of information that Recology

had a duty to disclose to Plaintiffs and the class. The fraudulent scheme continued through the pertinent period.

404.  Recology, acting through its officers and agents, and intending to defraud Plaintiffs and the class, sent or caused to be sent numerous emails for the purpose of furthering this overall scheme. Key to the entire scheme was "keeping Nuru happy."

405.  The overall scheme involved several "sub-schemes" to obtain rate increases.

406.  One sub-scheme was a scheme to improperly elevate the waste management rates through a rate increase application based on fraudulent representations and hidden by concealment of information Recology had a duty to disclose to Plaintiffs and the class. In the spring of 2015, Recology began preparing its next rate increase application. Recology's plan was to file a Notice of Intent on July 2, 2015.

407.  Throughout the pertinent period, Giusti furthered the scheme to intentionally defraud Plaintiffs and the class by arranging for payments to Giant Sweep at the direction of Nuru and Non-Profit A to influence Nuru's actions as a regulator. On information and belief, in taking these actions, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

408.  On May 20, 2015, Non-Profit A's Executive Director emailed to Giusti and Recology Assistant A, "We did not receive the Giant Sweep donation for May? Please advise."

409.  Within minutes, Giusti and Recology Executive 1, two persons in leadership positions at Recology, were emailing each other and others within Recology, urgently trying to find out what happened to the payment and arranging for a check to be cut and mailed as soon as possible. These emails were sent for the purpose of "keeping Nuru happy" so that, *inter alia*, he would assist Recology in defrauding Plaintiffs and the class in its 2015 rate application and other rate applications. The emails were sent in Giusti's and Recology Executive 1's capacities as officers of Recology and on Recology's behalf.

///

410.  Approximately one hour later, Recology Executive 1 himself, acting as an officer of Recology and on Recology's behalf, prepared, signed and emailed a check request form for the $30,000 payment to Non-Profit A, with a note indicating, "Please pay as soon as possible." He sent it to the accounts payable supervisor, asking her, "Can you pay off of this? If so, when can you pay? If not, let me know what we need to do. Our office is closed, [Recology Executive 2] is on vacation and this needs to be paid as soon as possible." This check was requested, via email, for the purpose of "keeping Nuru happy" so that, *inter alia*, he would assist Recology in scheme to defraud Plaintiffs and the class through its 2015 rate application and other rate applications.

411.  Acting in his capacity as an officer of Recology and on Recology's behalf, Recology Executive 1 also forwarded Giusti's 12:26 p.m. email about his encounter with Nuru to the Assistant Corporate Controller of Recology. He wrote, "FYI – Mohammed is the Director of the DPW who ultimately signs off on our rates. Needless to say, keeping him happy is important." This email was sent for the purpose of "keeping Nuru happy" so that, *inter alia*, he would assist Recology in its fraudulent 2015 rate application and other rate applications.

412. In June 2015, while Recology was preparing to submit the Notice of Intent for its planned rate increase application, Giusti, acting for Recology as an officer of Recology, arranged for Recology to hire NURU's son. This was done to keep Nuru happy.

413.  On the morning of June 17, 2015, Giusti, acting for Recology in his official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, met with Recology SF General Manager A to discuss the schedule for the upcoming rate increase application. That afternoon, Giusti forwarded Nuru's son's cell phone number to a Human Resources employee at Recology, telling her, "This is what I got from Mohammed." A few hours later the Human Resources employee advised Giusti that she would call Nuru's son and connect him with Recology's staffing agency.

414.  The next morning, on June 18, 2015, Recology Executive 1, acting for Recology in his or her official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, emailed the draft schedule for the rate application

process to Nuru's immediate subordinate at DPW. The draft schedule was intended to defraud Plaintiffs and the class by keeping Nuru happy by obtaining improperly elevated waste management rates based on fraudulent representations to the Rate Board and maintained over time by concealment of said improperly elevation of rates from Plaintiffs and class members.

415.  Approximately one hour later, Giusti advised Recology's Human Resources employee in an email that "Mohammed said he [Nuru's son] should be ready to start on Monday."

416.  Shortly afterwards, the Human Resources employee expressed concern about Nuru's son in an email to Giusti: "I feel like we are going to have issues. [Nuru's son] doesn't seem happy….I asked him if he still wanted to work at Recology, and he said he wanted to give it a try….I told him that he didn't seem to know much about the job, so I told him that he was going to be working from 8-2 M-F….What do you think?"

417.  Giusti acted in his official capacity in exchange emails with the Human Resources employee. These emails were done in furtherance of the scheme to hire Nuru's son in order to keep Nuru happy to further Recology's overall scheme of obtaining illegally elevated rate increases through bribery and corruption, as was the email from Recology Executive I to Nuru's immediate subordinate.

418.  The next evening, on June 19, 2015, the Human Resources employee sent Giusti an email with high importance, advising that she had contacted NURU's son again and he had completed the staffing agency paperwork that day and just needed to complete his work permit before he could start. On information and belief, in taking these actions regarding Nuru's son, Giusti acted for Recology in his official capacity as Recology's Group Government and Community Relations Manager for Recology, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole.

419.  Another sub- scheme was Recology's plan to illegally increase the rates it was paid as "tipping fees" by using Nuru's influence, which influence was illegally obtained by bribery and corruption.

420. On July 2, 2018, Recology Executive 1, acting for Recology and in his or her capacity as an officer of Recology, emailed Nuru, forwarding a price sheet including the increased tipping fees Recology desired. This email was sent for the purpose of executing Recology's plan to illegally increase the rates it was paid as "tipping fees."

421. Recology SF General Manager A, acting for Recology and in his or her capacity as an officer of Recology, forwarded the same July 2, 2018 email to the City employee responsible for the tipping fees contract between Recology and the City.

422. Recology subsequently invoiced the city for the new amount stated in the price sheet Recology Executive 1 had emailed to Nuru on July 2, 2018.

423. On November 26, 2018, Recology Executive 1, acting for Recology in his or her official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, forwarded to Nuru an email from Recology SF General Manager A stating that the City was not honoring the negotiated price increase, writing that "As discussed, any help you could provide getting the new purchaser aware of our price change would be appreciated." Nuru emailed back about 90 minutes later, "Working on situation."

424. In a phone call that same evening that discussed tipping fees Nuru requested that Giusti increase Recology's holiday party donation from $15,000 to $20,000

425. The next day, Giusti, acting for Recology in his official capacity, and at the behest of officers and executives of Recology with authority to make decisions for the entity as a whole, sent an email to Recology Assistant A with a check request for a $20,000 donation to the Lefty O'Doul Foundation, asking that the check be gotten out as quickly as possible.

426. The increased donation to the holiday party was for the purpose of "keeping Nuru happy" with the ultimate intention of enticing Nuru to approve elevated waste management rates based on fraudulent representations to the Rate Board and the subsequent fraudulent concealment of the fact that the rates were actually obtained by fraud, bribery and corruption.

*Harm to Plaintiffs Proximately Caused By Recology's Acts*

///

427.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-427 above, as though fully set forth herein.

428.    Recology's racketeering activities damaged plaintiffs, as detailed herein, by forcing them to pay improperly elevated waste management rates over a period of years. These elevated rates were directly caused by improper and unlawful waste management fee increases which accrued pursuant to the above-identified schemes of bribery, money laundering and wire fraud, and Nuru's actions unfairly and improperly favoring Recology in ratemaking as compensation for benefits he received pursuant to said schemes. The elevated rates directly impacted the pockets of members of the putative class, the City's ratepayers.

429.    Illegally-obtained profits from the Enterprise were extensive, as Recology reaped illegally elevated waste management rates over a period of years, beginning in 2013 and continuing until at least November 2020, when a federal investigation into these activities was publicly reported on, and possibly until the present day. Recology has already admitted, by way of a civil settlement with the City, that its actions cost City ratepayers at least the amount of the settlement, some $120 million including a second supplemental payment of $25 million in addition to the original $95 million payment made in March 2021. This settlement amount covers less than half of the pertinent period identified herein and, of course, does not include treble or exemplary damages.

*Effect On Interstate Commerce*

430.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-430 above, as though fully set forth herein.

431.    Recology benefited from the actions of the Enterprise by obtaining inflated revenues from the ratepaying residents of San Francisco. Recology was thus enabled to invest the inflated and wrongfully-earned excess revenues in physical plant including but not limited to recycling facilities, in Recology's affiliates in Washington and Oregon, and in increased salaries, advertising, executive bonuses and/or other areas wherein such investment accrued to the benefit of the entire organization and its owners, including in its facilities and operations in states other

1  than California.

2      432.    During the pertinent period, Recology charged its customers who pay for residential

3  waste pickup no more than half the normal residential per-gallon waste pickup fee to pick up

4  recycling bins provided by Recology, although picking up recycling bins, trucking recycled

5  materials to recycling centers, and subsequent processing of such materials are, on information

6  and belief, at least as expensive to Recology as picking up, trucking and processing non-recyclable

7  waste.

8      433.    On information and belief, Recology was enabled to provide this cut-rate service

9  because its charges for residential waste pickup during the pertinent period were nearly double the

10  residential waste payments made by customers in other Bay Area localities where waste

11  management contracts are let out by a competitive bidding process. Residential rates were so high

12  because they were inflated during the pertinent period by the bribery scheme detailed in this

13  pleading, and the bribery scheme provided a substantial portion of Recology's increase in waste

14  management collection revenues during the pertinent period.

15      434.    Materials picked up in recycling came from wherever ratepayers purchased goods,

16  including a very significant amount of goods that were manufactured and/or assembled and/or

17  packaged in foreign nations or other states.

18      435.    On information and belief, the increased revenue from waste collection stemming

19  from rate increases procured by bribery during the pertinent period allowed Recology to promote

20  recycling more heavily, to provide recycling services at half cost as detailed *supra*, and to pay

21  trucking and other fees associated with increased amounts of recycling, These funds also helped

22  Recology pay for upgrading its recycling centers. For example, using its excessive profits,

23  Recology opened a new 85,000 square foot material recycling facility in Santa Rosa, California,

24  part of a $60 million dollar funding expenditure to increase Recology's recycling volume.

25  Recology also used its excess profits to retool its 200,000 square foot materials recovery facility,

26  Recycle Central, including by (1) enhancing its commingled recyclable sorting system in 2016 to

27  add capacity and improve its separating equipment capability, improvements that increased the

28

facility's throughput and recovery rate and allowed Recology to target new materials; (2) significantly improving the plant's functionality and efficiency in 2017 by installing a new metering drum system on the back-up line with new infeed hoppers on the original commingled lines, along with a new cross belt magnet for enhanced recovery of ferrous items out of the glass stream, a container system bypass line to improve plant functionality, and an upgrade to the plant-wide Master Control System; and (3) greatly improving its automated sorting system by adding four robotic sorters in 2019. The company also (4) doubled the size of the recycling carts it provided to ratepayers during the pertinent period.

436.    In 2020, Recology devised plans to modernize its construction and demolition system, renovate the existing Eastern construction and demolition sorting line, overhaul the construction and demolition conveyer belt, and improve its electrical system to accommodate modern variable speed drive technology.

437.    These investments stemming from the illegal bribery scheme led to a 9% or more increase in recycling pickups by 2019 and thereafter. Not only did this mean that Recology *picked up* more goods acquired in interstate and/or foreign commerce, but this increase, along with the facility improvements detailed *supra*, led to a similar increase in Recology's *sale* of recycling materials in interstate and foreign commerce. The net result was an increased flow in recycling materials to Recology's recycling centers, which in turn sold recycled products and raw materials, including significant amounts of same sold in interstate and foreign commerce in a greater amount than would have been sold but for the rate increases procured through an illegal bribery and money laundering scheme.

438.    On information and belief, during the pertinent period Recology cultivated its relationships with foreign and interstate mills in order to sell larger amounts of recycled materials in foreign and interstate commerce.

439.    Paper and cardboard recycling materials form a major portion by cost and normally the largest portion by volume of any urban recycler's output, including Recology's. While some of Recology's sales of bales of paper and cardboard recycled materials occur in California, the

greater proportion were sold in other states, in Canada, and especially in countries that border the Pacific Ocean. Although China has recently implemented new rules greatly restricting its import of recycled materials, during the early part of the class period China was the greatest purchaser of recycled cardboard and paper bales, including, on information and belief, purchasing approximately 70% of Recology's recycle cardboard and paper bales, and China remains an important purchaser to this day.

440.   On information and belief, Recology also recycles significant amounts of aluminum, largely for sale to aluminum producers, accepting aluminum cans, foil, trays, empty aerosol cans and aluminum jar lids from single-family and multi-family residences (https://www.recology.com/wp-content/uploads/2023/05/DiR-Newstart.2-11-20.pdf).       On information and belief, the world's five leading aluminum manufacturing nations are China, India, Russia, Canada, and the United Arab Emirates. On information and belief, the major aluminum smelting plants in the United States are located in the states of Indiana, New York, South Carolina, Kentucky, Missouri, Washington, West Virginia, Montana and Texas. On information and belief, Recology primarily provides recycled aluminum to Canada and to nations located on the Pacific Ocean, as well as to manufacturers in other states, and comparatively little to enterprises located in California.

441.   Recology touts these expenditures and sales as part of the "circular economy." (https://www.recology.com/recology_news/the-truth-about-recycling/). Recology argues that "we're better off reusing, repairing, redesigning, recycling, and composting material to keep it in circulation as long as possible." (*Id.*) In fact, the "circular economy" is not circular in regard to ratepayers. Although the recycling materials come from ratepayers, the money does not "circle" back to them but stays in Recology's coffers.

442.   Further, the illegally obtained profits of the bribery scheme went to Recology, a multi-state entity which operates waste collection services in Nevada, Oregon and Washington as well as in California. Recology manages and disburses money to these affiliates, including disbursing a part of the profits from the bribery scheme. On information and belief, significant

1   amounts of this money flowed across state lines to such related entities and affected interstate
2   commerce thereby.

3       443.    The racketeering activity also affected interstate commerce by wrongfully
4   depriving Plaintiffs and the class of $120 million or more, some significant percentage of which
5   would otherwise have been spent in interstate commerce.

6       444.    On information and belief, ratepayers make approximately 16% of their purchases
7   from online retailers.

8       445.    On information and belief, approximately 20% of all online transactions are cross-
9   border transactions, i.e., purchases from another state or country.

10      446.    Using those figures, on information and belief 3.2% of residential ratepayers' retail
11  spending is online purchases from another state or country.

12      447.    On information and belief, residential ratepayers would have spent at least 1/3 of
13  the $120 million that Recology's corrupt scheme cost them in retail spending. 3.2% of 1/3 of $120
14  million is $1.28 million that residential ratepayers would have spent in cross-state or cross-border
15  online retail purchases but for the bribery scheme.[7]

16      448.    Therefore the loss of $120 million out of Plaintiffs' and the class's disposable
17  income means that Plaintiffs and the class did not spend in online interstate or foreign commerce
18  at least over a million dollars that they would have spent but for the bribery scheme in online
19  interstate or foreign commerce and impacted interstate commerce thereby.

20      449.    On information and belief, the stocks of manufactured products purveyed by large
21  brick-and-mortar retailers like Walmart, Target and Sam's Club, as well as those placed into
22  commerce by purveyors of automotive, construction and farm equipment are primarily composed
23  of products that were manufactured either abroad or in other states because wages in California
24  are significantly higher than in other states or in foreign territories where such goods are much
25  more commonly manufactured. These outlets and products are as popular and successful with

26  _____

27  [7] At trial, Plaintiffs' expert witnesses can sharpen these calculations and provide more definite
    estimates of how much ratepayers would more likely than not have spent in interstate and foreign
28  commerce had Recology not taken their money. We believe the above estimates are conservative.

ratepayers as with everyone else, and ratepayers would have doubtless spent significant amounts of the money they lost to the bribery scheme on goods manufactured out of state but sold in retail stores or at automotive or equipment dealerships in the Bay Area had the bribery and corruption scheme not occurred. The bribery scheme deprived those ratepayers of significant income every month, some portion of which would have been spent in interstate or foreign commerce in the establishments described.

450.    On information and belief, due to the wage disparity between wages of California workers and wages of workers in certain other states and certain foreign nations, not only large retailers like those listed above but most non-food retailers in the San Francisco Bay Area selling manufactured products sell products which are primarily produced in production facilities in other states or abroad, where labor is available at a lower price. Had Plaintiffs and the class not been deprived of $120 million or more of their hard-earned money, they would have spent a significant amount at retail stores on purchasing products shipped in interstate commerce from other states or from abroad. The fact that they did not has a significant impact on interstate and foreign commerce.

451.    For example, on information and belief, approximately 32,000 people work in automobile manufacturing in California out of the approximately 1.7 million automobile manufacturing workers in the United States and compared to the approximately 8 million workers engaged in automobile manufacturing in other countries. On information and belief, the overwhelming majority of automobiles on California streets and highways were manufactured outside of California. On information and belief, depriving Plaintiffs and the class of $120 million or more means that a significant number of automobiles that would have been purchased in interstate or foreign commerce by Plaintiffs and the class were not purchased. This is but one example, but this example alone shows that Recology's bribery and corruption has a significant impact on interstate commerce.

452.    Another example is cell phones. While California and the Bay Area are major hubs for cell phone development and design, manufacture is a different story. Approximately 75% of the approximately 1.4 billion cell phones produced annually worldwide are manufactured in China.

FOURTH AMENDED CLASS ACTION COMPLAINT

India is the world's second-largest cell phone producer. On information and belief, the overwhelming majority of cell phones purchased by Plaintiffs and the class during the pertinent period were manufactured in interstate or foreign commerce. On information and belief, depriving Plaintiffs and the class of $120 million or more means that a significant number of cell phones that would have been purchased in interstate or foreign commerce by Plaintiffs and the class were not purchased.

453.    These goods are but two examples where Recology's bribery and corruption has a significant impact on interstate and foreign commerce.

*The Conspiracy*

454.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-454 above, as though fully set forth herein.

455.    Recology conspired with and directed the other members of the Enterprise to commit predicate offenses, and at times funded the commission of such offenses, for the purpose of unlawfully obtaining elevated waste management rates, causing financial damage to Plaintiffs in violation of the RICO Act.

456.    Recology conspired with the other members of the Enterprise, and directed the Enterprise, in perpetrating multiple discrete schemes to gain Nuru's favor, including, *inter alia*:

(1) a scheme to consistently fund, for Nuru's personal and professional benefit and over the course of several years, the Giant Sweep charity;

(2) a scheme to consistently fund, for Nuru's personal and professional benefit and over the course of several years, multiple Department of Public Works Christmas parties, which ongoing scheme itself included a discrete scheme, as detailed herein, to obtain a discrete rate increase for a service denominated "tipping fees" by a one-time increased Christmas party donation;

(3) a scheme to fund, for Nuru's personal and professional benefit, the mortuary fee of a Department of Public Works employee; and

(4) a scheme to fund, for Nuru's personal benefit, a scheme to employ and pay Nuru's son for services he was not qualified to provide.

(5) a scheme to launder the money used to fund these various activities. These individual schemes were related to each other as part of an overarching general scheme, consistently carried out over the course of several years.

457.    The purpose of each of the individual schemes was to further the greater scheme by making Nuru happy enough to favor Recology in ratemaking processes, leading in turn to Recology's successfully reaping wrongfully elevated waste management rates at vast profit to Recology.

458.    The individual schemes each resulted in Nuru's happiness with Recology and the wrongful use of his influence and authority to ensure repeated approval of wrongfully elevated rates throughout the pertinent period.

459.    Recology, Giusti acting for Recology and Nuru were common participants in these individual schemes. Nick Bovis, the Lefty O'Doul Foundation for Kids, Non-Profit A and Non-Profit B were also common participants in certain of the schemes.

460.    The various members of the Enterprise each had a role to play: Nuru, in consultation with his confederates, indicated to Recology where funds were needed; Recology provided funds through Giusti and as approved by Giusti's superiors, including Recology Executive 1, Recology Executive 2 and Recology SF General Manager A; Non-Profit A, Nick Bovis and the Lefty O'Doul's Foundation for Kids laundered the funds Recology provided, including to Non-Profit B, which set up a slush fund for use by Nuru and his confederates; Nuru, with Recology's knowledge and consent, oversaw the flow of the funds as described as well as expenditure of the funds; and finally, in exchange for all this, Nuru approved wrongful and excessive waste management rates for Recology, harming plaintiffs thereby. Plaintiffs were victimized by each of the individual schemes, each of which was responsible for causing some portion of Nuru's happiness and therefore some portion of the improper and unlawful rate elevation that devolved from said happiness. Each of the individual schemes was committed by similar methods, specifically, the provision by

Recology of sizeable sums of money seemingly provided for a charitable purpose but with a hidden, and common, true purpose: to make Nuru happy and reap elevated waste management rates through bribery and public corruption.

*Relief Sought*

461.    Plaintiffs and the Class therefore seek compensatory, general and specific damages, and treble damages for Recology's unlawful actions, as well as attorney's fees and injunctive relief, including the relief described *supra* that would lead to competitive bidding for San Francisco municipal waste management services.

## PUNITIVE DAMAGES ALLEGATIONS

### (All Defendants)

462.  Plaintiffs re-allege each and every allegation in this Complaint and incorporate each allegation into this Count, as if set forth at length, in its entirety.

463.  Plaintiffs are entitled to an award of punitive and exemplary damages based upon Defendants' intentional, willful, knowing, fraudulent and malicious acts, omissions and conduct, and their complete and total reckless disregard for good governance, the law, and their duties to the ratepaying public.

464.    All Defendants:

a.    Willfully, illegally and corruptly provided valuable gifts and other consideration to influence public officers in the performance of their duties;

b.    Concealed information from and submitted fraudulent data to the rate board for the purpose of receiving corruptly and unlawfully inflated rates for waste collection;

c.    Wrongfully and maliciously accepted inflated rates from ratepayer citizens and accepted and retained unearned monies from the ratepayers, unjustly enriching themselves thereby at the expense of the oppression of the ratepayers; and

d.    Fraudulently concealed their wrongful, corrupt, malicious and unlawful conduct from ratepayers, the City, the public, and law enforcement.

465.    As a direct, proximate, and legal result of Defendants' willful, malicious, oppressive

FOURTH AMENDED CLASS ACTION COMPLAINT

and fraudulent acts as described herein, the ratepayer plaintiffs have suffered serious and ongoing economic harm.

466.    But for Defendants' willful, malicious, oppressive and fraudulent practices, Plaintiffs could have properly objected to and perhaps prevented the implementation of the improper rates.

467.    Plaintiffs and all other similarly situated rate-paying customers of the City and County of San Francisco request further relief as described below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment against Defendants as follows:

1.    For an Order certifying the proposed Class and designating this action as a class action pursuant to Code of Civil Procedure §§ 382 and 1781;

2.    For an award to Plaintiffs and Class members of all proper restitution, including interest to which they are entitled;

3.    For such other relief provided by statute, including equitable, injunctive and/or declaratory relief as the Court may deem just and proper;

4.    For full, fair, and complete recovery for all claims and causes of action relevant to this action;

5.    For compensatory, general and specific damages, and to be made whole from Recology's breach of its implied and/or express contract with Plaintiffs and the Class.

6.    For treble damages;

7.    For punitive damages;

8.    For the costs of bringing this suit, and reasonable attorneys' fees pursuant to Code of Civil Procedure §1021.5;

9.    For an injunction prohibiting Defendants from continuing the unlawful conduct described herein;

10.    For such other injunctive relief as the Court may deem appropriate after consideration of the factual record.

11.    That the Court declare that Defendants have engaged in unfair competition and have been unjustly enriched;

12.    For Defendants to be ordered and enjoined to restore to Plaintiffs and Class members any money or property that Defendants, and each of them, may have acquired by means of criminal, unlawful, unfair and/or fraudulent business acts and practices as described in this Complaint; and

13.    For all other legal and equitable relief as deemed just and proper by this Court.

## **DEMAND FOR JURY TRIAL**

Plaintiffs William Villarroel, Liese L. Sand and Robert F. Sand, and the class, hereby demand a trial by jury on all issues triable by a jury in the above-entitled action.

Dated: April 18, 2025                          **ONGARO PC**

By: _____
DAVID R. ONGARO
SCOTT S. SHEPARDSON
GLEN TURNER
Attorneys for Plaintiffs

FOURTH AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Francisco, State of California. My business address is 1604 Union Street, San Francisco, CA 94123.

On April 18, 2025, I served a true and correct copy of the document(s) described as:

**PLAINTIFF'S FOURTH AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, TREBLE DAMAGES, RESTITUTION AND INJUNCTIVE RELIEF**

on the interested party(ies) in this action as follows:

Tiffany Cheung
Robert W. May
Morrison & Foerster LLP
425 Market St.
San Francisco, CA 94105
P: +1 (415) 268-6848
TCheung@mofo.com
RMay@mofo.com

***Attorneys for Defendants Recology, Inc., Recology San Francisco, Recology Golden Gate and Sunset Scavenger Company***

**[X] BY ELECTRONIC TRANSMISSION/E-MAIL:** Based on an agreement of the parties to accept service by e-mail or electronic transmission, I sent the document(s) on the date shown below to the e-mail addresses of the persons listed above. I did not receive within a reasonable time after the transmission any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April 18, 2025, at Mountain View, California.

_____
Emily Groleski

PROOF OF SERVICE